UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* <br> Keisha Kelschenbach, <br><br> *Plaintiff,* <br><br> *v.* <br><br> M&T BANK CORPORATION, <br><br><br><br> *Defendant.* | QUI TAM COMPLAINT <br> AND <br> DEMAND FOR A JURY TRIAL <br><br> FILED UNDER SEAL <br> PURSUANT TO <br> 31 U.S.C. §§ 3729 *et seq.* <br><br> Civil Action No. <br><br> _____ |

Relator Keisha Kelschenbach brings this qui tam action in the name of the United States of America, by and through her undersigned attorneys Thomas & Solomon LLP, and alleges as follows.

## INTRODUCTION

1.  This is a civil fraud action by qui tam Relator Keisha Kelschenbach, on behalf of the United States ("the Government"), against defendant M&T Bank Corporation ("Defendant") to recover penalties and damages arising from false statements and certifications Defendant made to the United States in connection with its mortgage lending business, including with respect to certifications made in connection with Defendant's efforts to increase its profits through various programs operated by the United States (individually and collectively, the "Government Programs").

2.  This action seeks to recover treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and civil penalties under the Financial

Institutions Reform, Recovery, and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").

3.     Defendant engaged in a regular practice of reckless origination and underwriting of mortgage loans participating in Government Programs.  As a result of Defendant's culture, practice and scheme to maintain aggressive efforts to continually increase profits by means including avoiding its fiduciary duties to the Government and its obligation to comply with the requirements set forth by the Government Programs, Defendant has improperly and knowingly presented or caused to be presented claims for payment to the Government that, upon information and belief, the Government would not have paid but for Defendant's false statements, including Defendant's certifications that it had complied with the Government Programs.

4.     Defendant has profited for years from its participation in the Government Programs while submitting false statements to the Government about its underwriting, processing, due diligence, quality control and other aspects of compliance with the Government Programs.  Defendant failed to implement quality control measures to stop its reckless lending practices.   Defendant's misconduct has resulted in damages to the Government, with additional losses expected in the future, as well as mortgage defaults and home evictions and foreclosures.

5.     The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or who otherwise improperly makes false statements to the Government.  31 U.S.C. § 3729(a)(1)(A)-(G).  The False Claims Act further provides that any person who violates the Act "is liable to the United States Government for a civil

penalty … plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

6.      Under the FCA, liability attaches when a defendant submits or causes another to submit a claim for payment from Government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used for obtaining approval of a false or fraudulent claim for Government funds.  Liability also attaches under the FCA when a defendant knowingly makes, uses, or causes to be made, a false record or statement to conceal, avoid or decrease an obligation to pay to the Government.

7.      The FCA permits any person having information regarding a false or fraudulent claim for payment from Government funds to bring an action for himself as the Relator and for the Government and allow him to share in any recovery.

8.      Based on the foregoing provisions, Relator Kelschenbach asserts violations of Federal law as a result of false claims made by Defendant in connection with the Government Programs.

9.      Relator Kelschenbach seeks to recover all available damages, civil penalties, and all other relief available for expenditures impacted by Defendant's fraud, including treble damages and penalties under the FCA and FIRREA.  Damages owed to the Government include, but are not limited to, the full value of all reimbursements pursuant to Government Programs that the Government would not have paid but for Defendant's false claims and certifications, including Defendant's certification that it had complied with and was eligible to participate in the Government Programs.

10.     Defendant's wrongful practices include improperly and knowingly submitting or causing to be submitted false claims for reimbursement to Government Programs, by a

scheme whose methods include applying pressure on loan officers and underwriters to originate and approve more and more loans for participation in Government Programs as quickly as possible, failing to satisfy its duty to conduct proper due diligence in underwriting and processing mortgage applications submitted in connection with Government Programs, failing to provide sufficient training and guidance to its inexperienced staff, employing underwriters who were unqualified to properly perform their duties, among others.

11.    Defendant also improperly and knowingly presented or caused to be presented claims for payment on the basis of false statements and on the basis of false certifications that Defendant was in compliance with applicable standards and requirements of the Government Programs.

12.    Upon information and belief, the Government would not have paid those claims had it been aware of the falsity of Defendant's claims and certifications.

13.    Upon information and belief, the Government would not have permitted Defendant to participate in the Government Programs had it been aware of Defendant's false certifications of compliance with those programs and/or Defendant's culture, practices and scheme to increase profits through misuse of the Government Programs.

### JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732, conferring jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730, and pursuant to 28 U.S.C. § 1331, conferring jurisdiction over all civil actions arising under the laws of the United States.

15.    Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1), (b)(3), and (c) because Defendant can be found and transacts business in this

judicial district.

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendant in this District.  Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).

17.     This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730, but rather information from Relator.

18.     In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source as defined by the FCA.  Relator has direct and independent knowledge of the information on which these allegations are based, and witnessed directly the fraudulent actions and representations by Defendant against the Government.

19.     Relator shall concurrently serve a copy of this Complaint upon the United States.  Relator will also serve upon the United States a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

20.     Defendant is a New York corporation with a principal place of business located at One M&T Plaza, 12th Floor, Buffalo, New York 14203-2399.  Defendant conducts business throughout the United States.

21.     Relator is a resident of Kenmore, New York.   From approximately 1996 through April 2012, Relator was employed by Defendant in Buffalo, New York as a Senior Underwriter.

## FACTUAL BACKGROUND

### Civil Statutes to Combat Mortgage Fraud

22.     The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."   31 U.S.C. § 3729(a)(1)(A)-(B).   The False Claims Act further provides that any person who violates the Act "is liable to the United States Government for a civil penalty ... plus 3 times the amount of damages which the Government sustains because of the act of that person."   31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

23.     The Fraud Enforcement Recovery Act of 2009 ("FERA") amended the False Claims Act to define "claim" to include: "any request or demand, whether under a contract or otherwise, for money or property . . . made to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . ." 31 U.S.C. § 3729(b)(2).

24.     Congress enacted FIRREA in 1989 to reform the federal banking system. Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses—as established by a preponderance of the evidence—that affect financial institutions

and certain government agencies. *See* 12 U.S.C. § 1833a(e).

25.    FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $1 million per day or $5 million, whichever is less.  12 U.S.C. § 1833a(b)(1)-(2).  The statute further provides that the penalty can exceed these limits to permit the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.  18 U.S.C. § 1833a(b)(3).

26.    FIRREA, *inter alia*, prohibits any person connected in any capacity with HUD from making any false entry in any book, report or statement of or to HUD with the intent to defraud HUD or any other body politic or to deceive any officer, auditor, examiner, or agent of HUD or of a department or agency of the US.

27.    FIRREA, *inter alia*, prohibits any person from knowingly making any false statement or report, or willfully overvaluing any land, property, or security, for the purpose of influencing in any way the action of Government Programs.

28.    FIRREA, *inter alia*, prohibits using the mails or wires for the purpose of executing a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

29.    FIRREA, *inter alia*, prohibits any person from, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation.

### The Government Programs

30.    Defendant participates in numerous Government Programs in connection with

its mortgage lending business including, *inter alia*, the FHA Mortgage Insurance Program ("FHA") of the United States Department of Housing and Urban Development ("HUD"), the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and others (individually and collectively, the "Government Programs").

31.     The Government Programs require participants, including Defendant, to meet certain standards and requirements in connection with participation in the Government Programs, including requirements in connection with underwriting loans referred to the Government Programs.

32.     The Government Programs also require participants, including Defendant, to certify its compliance with the Government Programs for purposes of eligibility to participate in the Government Programs.

33.     The Government Programs also require participants, including Defendant, to certify compliance with the relevant standards and requirements with respect to the requirements and standards of the Government Programs with respect to each specific mortgage loan submitted for inclusion in the Government Programs.

34.     The following are a non-exhaustive description of the standards and requirements set forth by the Government Programs.

*The FHA Mortgage Insurance Program*

35.     FHA, a part of HUD, is the largest mortgage insurer in the world, insuring approximately one third of all new residential mortgages in the United States. Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs. Through these programs, FHA insures approved lenders ("mortgagees") against losses on

mortgage loans made to buyers of single-family housing. The programs help low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans. FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.

36.     Under HUD's mortgage insurance programs, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. HUD also incurs expenses in managing and marketing the foreclosed-upon property until it is resold. By protecting lenders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of creditworthy Americans who might not otherwise satisfy conventional underwriting criteria. FHA mortgage insurance also makes mortgage loans valuable in the secondary markets, as FHA loans are expected to have met HUD requirements and because they are secured by the full faith and credit of the United States.

37.     In the event that a borrower defaults on an FHA-insured mortgage, the lender or other party holding the mortgage submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property. HUD then pays off the balance of the mortgage and other related costs and may assume ownership of the property.

38.     HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage programs. A Direct Endorsement Lender is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior HUD review or approval. To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD requirements (*e.g.*, income, credit history, valuation of property, etc.).

39.   HUD relies on the expertise and knowledge of Direct Endorsement Lenders in providing FHA insurance and relies on their decisions.  A Direct Endorsement Lender is therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with HUD.  The duty of good faith also requires a Direct Endorsement Lender to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

*FHA Underwriting and Due Diligence Requirements*

40.   A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.  The underwriter must evaluate each mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures. In addition, the underwriter must have each property appraised in accordance with the standards and requirements prescribed by HUD.

41.   Mortgagees must employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud, in addition to the responsibility that underwriting decisions are performed with due diligence in a prudent manner. The lender must also maintain a compliant compensation system for its staff.

42.   HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans.  The purposes of due diligence include (1) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and

collection difficulties and (2) examining a property offered as security for the loan to determine if it provides sufficient collateral. Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral. In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment.

43.     HUD has set specific rules for due diligence predicated on sound underwriting principles. In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to Direct Endorsement Lenders. These materials specify the minimum due diligence with which Direct Endorsement Lenders must comply.

44.     With respect to ensuring that borrowers have sufficient credit, a Direct Endorsement Lender must comply with governing HUD Handbooks to evaluate a borrower's credit.

45.     To properly evaluate a borrower's credit history, a Direct Endorsement Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

46.     With respect to appraising the mortgaged property (*i.e.*, collateral for the loan), a Direct Endorsement Lender must ensure that an appraisal and its related documentation satisfy the requirements in governing HUD Handbooks.

*FHA Quality Control Requirements*

47.     Furthermore, to maintain HUD-FHA approval, a Direct Endorsement Lender must implement and maintain a quality control program.  HUD requires the quality control department to be independent of mortgage origination and servicing functions.  To comply with HUD's quality control requirements, a lender's quality control program must (among other things): (a) review a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (b) conduct a full review of all loans going into default within the first six payments, which HUD defines as "early payment defaults."

48.     In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information.

49.     The HUD Handbook lays out a rating system for the quality control reviews, in which the lender implements a system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review.

50.     In addition to reporting loans affected by fraud or other serious violations to HUD, the lender is required to take corrective action in response to its findings.   In particular, quality control review findings must be reported to the mortgagee's senior management within one month of completion of the initial report and management must take prompt action to deal appropriately with any material findings.  The final report or an addendum must identify the actions being taken, the timetable for their completion, and any

planned follow-up activities. Appropriate action by management includes following up with underwriters responsible for material findings to ensure that they are properly trained and diligently reviewing each file before endorsing it for FHA mortgage insurance.

*FHA Direct Endorsement Lender Certifications*

51.     Every Direct Endorsement Lender, including Defendant, must make an annual certification of compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan (the "Annual Certification"). The Annual Certification states, in sum or substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

Absent a truthful Annual Certification, a lender is not entitled to maintain its direct endorsement lender status and is not entitled to endorse loans for FHA insurance.

52.     In addition to the Annual Certification requirement, after each mortgage closing, the Direct Endorsement Lender must certify that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A. For each loan that was underwritten with an automated underwriting system approved by FHA, the lender must additionally certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id*. For each loan that required manual underwriting, the lender must additionally certify that the underwriter

"personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage. ..." *Id.* HUD relies on each certification to endorse the loan and provide the lender with a mortgage insurance certificate.

***The Other Government Programs***

53.   Defendant also participates in other Government Programs, including, *inter alia*, Fannie Mae and Freddie Mac.

54.   Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs") chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

55.   As part of their mission, Fannie Mae and Freddie Mac purchase single-family residential mortgages from mortgage companies and other financial institutions, providing revenue that allows the mortgage companies to fund additional loans.  The GSEs then either hold the loans in their investment portfolios or bundle them into mortgage-backed securities ("MBS") that they sell to investors.

56.   The GSEs earn revenue in their single-family business line primarily from "guarantee fees," *i.e.*, fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans pooled into MBS.  In general, the GSEs are profitable so long as their income from investments and guarantee fees exceeds the principal and interest that they must pay out on any defaulted loans that they guarantee.

57.   Prior to late 2007, GSE preferred stock was widely regarded to be a safe

investment.  In fact, federal regulators permitted banks to invest up to 100 percent of their investment capital in GSE preferred securities.  In the second half of 2007 and the first half of 2008, however, as the default rates on defaulted loans climbed, Fannie Mae lost $9.5 billion and Freddie Mac lost $4.7 billion.  Accordingly, Fannie Mae's Form 10-K for 2007 reported a "material increase in mortgage delinquencies and foreclosures . . ." and expected "increased delinquencies and credit losses in 2008 as compared with 2007."

58.    On July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified at 12 U.S.C. § 4617), Congress created the Federal Housing Finance Agency ("FHFA"), a federal agency, to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  The FHFA is located at Constitution Center, 400 7th Street, SW in Washington, D.C.

59.    On September 6, 2008, pursuant to HERA and in response to the insolvency of the GSEs due to mortgage defaults and delinquencies, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs.  12 U.S.C. § 4617(b)(2).

60.    Simultaneous with the placement of Fannie Mae and Freddie Mac into conservatorships, the United States Department of Treasury ("Treasury") exercised its authority under HERA to "purchase any obligations and other securities" issues by the GSEs and began to purchase preferred stock pursuant to the Senior Preferred Stock Purchase Agreements ("PSPAs").

61.    On September 7, 2008, following the conservatorship of Fannie Mae and Freddie Mac and Treasury's purchase of GSE preferred stock, the value of the GSEs' stock

was eliminated. As a result, certain community banks that had concentrated investments in GSE preferred stock failed entirely, and others suffered significant losses. The failure of these community banks has led to billions of dollars in losses to the Deposit Insurance Fund.

62.     Since the conservatorship, Treasury has made quarterly capital contributions to each of the GSEs. As of December 31, 2012, Treasury has provided more than $187 billion in support to the GSEs. These federal funds have been used primarily to cover losses from single-family mortgages purchased and guaranteed by the GSEs between 2004 and 2008, but have also been used to purchase mortgages sold in 2009 from lenders including Defendant, and to reimburse losses incurred by the GSEs as a result of guaranteeing those mortgages. Since 2008, the GSEs have suffered net losses of $208 billion in their single-family mortgage business.

*Fannie Mae and Freddie Certifications*

63.     In purchasing loans for their single family business, GSEs operate on a "rep and warrant model" relying on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements. Specifically, the loans sold to Fannie Mae must comply with its Single Family Selling Guide (the "Selling Guide"). Loans sold to Freddie Mac must comply with its Single-Family Seller/Servicer Guide (the "Freddie Guide") and purchase contracts.

64.     The purchase contracts between a GSE and a lender include both a long-term master agreement that supplements the relevant selling guide and short-term contracts that grant variances or waivers from the selling guide requirements to permit a lender to sell a specific loan product. The GSEs typically renegotiate such variances on an annual basis

based on the performance of the applicable loan product and other factors, and may decide to adjust the pricing on the affected loans for the following year or eliminate the variance altogether.

65.     The rep and warrant model operates on the assumption that the sellers of the loans—usually also the originators of the loan—are in a superior position of knowledge about the quality of those loans.  Lenders assume certain obligations in accordance with their superior position of knowledge, such as the duty to perform prudent underwriting and quality assurance checks as required by the guidelines, and to self-report loans they identify as fraudulent, noncompliant with GSE guidelines, or otherwise materially defective.  The GSEs also delegate the underwriting of the loans they purchase to the lenders.  Although the GSEs reserve the right to sample a portion of the loans they purchase to ensure compliance with the guidelines, they generally conduct full file reviews only if a loan goes into default.

66.     Upon information and belief, Defendant entered into a Mortgage Selling and Servicing Contract (the "Master Contract") with Fannie Mae.  As set forth in that Master Contract, in sum or substance, Defendant as lender made several specific warranties regarding each mortgage, including warranties that its mortgage conforms to all applicable requirements in the Guides and the Master Agreement, and that Defendant knows nothing involving the mortgage, the property, the mortgagor, or the mortgagor's credit standing that can reasonably be expected to: (i) cause private institutional investors to regard the mortgage as an unacceptable investment; (ii) cause the mortgage to become delinquent; or (iii) adversely affect the mortgage's value or marketability.

67.     Upon information and belief, the relevant agreements expressly affirmed that Defendant's representations apply in their entirety to each mortgage it sold to Fannie Mae,

were made as of the date transfer is made, and continue after the purchase of the mortgage.

68.     In representing to Fannie Mae that the loan sold to the GSEs is an acceptable investment, Defendant further warranted that: (i) all required loan data is true, correct, and complete; (ii) automated underwriting conditions are met for loans processed through an automated underwriting system, and (iii) no fraud or material misrepresentations has been committed by any party, including the borrower.  These requirements were set forth in the Selling Guides, and remain in effect today.

69.     Defendant further warranted that its quality control department takes certain post-closing measures intended to detect problems with loan manufacturing quality, including: (i) reviewing data integrity within automated underwriting systems; (ii) re-verifying underwriting decisions and documents; (iii) re-verifying fieldwork documents (including as to appraisal and title); (iv) reviewing closing and legal documents; and (v) conducting regular reviews of internal controls relating to loan manufacturing quality and fraud prevention.  These requirements were set forth in the yearly versions of the Selling Guide.

70.     Similarly, the Freddie Guide provides that "[a]s of the Delivery Date, the Funding Date and the date of any substitution of Mortgages pursuant to the Purchase Documents, the Seller warrants and represents the following for each Mortgage purchased by Freddie Mac: (1) The terms, conditions, and requirements stated in the Purchase Documents [defined to include the guidelines and contacts] have been fully satisfied; (2) All warranties and representations of the Seller are true and correct; (3) The Seller is in compliance with its agreements contained in the Purchase Documents; [and] (4) The Seller has not misstated or omitted any material fact about the Mortgage."  These representations were set forth in the

yearly versions of the Freddie Guide.

71.     Upon information and belief, Defendant entered into a Master Agreement with Freddie Mac that provides, in sum or substance, that Defendant as seller complied with all requirements of the *Freddie Mac Single-Family Seller/Servicer Guide* and the other Purchase Documents, as modified and supplemented by the terms of the Master Agreement.

72.     Defendant's representations that it was underwriting and delivering investment-quality mortgages according to the GSEs' selling guides and contractual requirements were material to the GSEs' decisions to purchase mortgage loans.

73.     When a GSE identifies a material breach of a warranty, usually during a post-default quality review of a loan, it may demand that the lender repurchase the loan and/or reimburse the GSE for any loss incurred.

*Defendant Participated in Other Government Programs*

74.     In addition to the foregoing, Defendant also participated in, and falsely certified loans to the Government in connection with, other Government Programs.

75.     For example, Defendant participated in home mortgage programs run by the Veteran's Administration (the "VA Home Loans"). VA Home Loans are loans provided by private lenders, such as Defendant, and guaranteed in part by the Government to enable veterans to obtain more favorable loan terms.

76.     In connection with VA Home Loans, Defendant certified to the Government, in sum or substance that the loan application, all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 C.F.R. part 36; that all credit reports obtained in connection with the processing of the borrower's loan application have been provided to VA; that, to the best of the lender's

knowledge and belief, the loan met the underwriting standards recited in Chapter 37 of title 38 United States Code and 38 C.F.R. Part 36; and that all information provided in support of the loan was true, complete, and accurate to the best of the lender's knowledge and belief.

**Defendant's Practices and Systematic Efforts to Maximize Profits From Government Programs**

77.     The Government Programs rely upon participants, including Defendant, to diligently comply with the requirements and standards set forth by the Government Programs and to certify compliance, both with respect to participation in the Government Programs and/or with respect to individual loans referred for participation in the Government Programs.

78.     Defendant, however, sought to maximize profits from the Government Programs by ignoring underwriting, quality and other standards in an effort to increase loan volume, contrary to its certifications and representations to the Government.

79.     Defendant required underwriters to make loan decisions on extremely short turnaround times and employed lax and inconsistent underwriting standards and controls which failed to comport with the standards and requirements of the Government Programs. The heavy volume of loans overwhelmed underwriters, further contributing to extremely poor loan quality. Moreover, particularly during busy periods, Defendant attempted to further increase loan volume by permitting unqualified and inadequately trained individuals to underwrite loans. Defendant improperly waived and ignored conditions underwriters had placed on loan approvals to permit the loans to close even where necessary and proper conditions had not been met. Through these and a variety of other practices, Defendant increased its loan volume at the expense of Government requirements and standards, all in contradiction to Defendant's certifications of compliance with the Government Programs.

80.     As a prerequisite to participating the in the Government Programs, Defendant expressly certified (or, through participation in the Government Program, impliedly certified) its compliance with the requirements of the Government Programs.  Additionally and/or in the alternative, in submitting each loan for insurance or other participation in a Government Program, Defendant expressly or impliedly certified that it had complied with the requirements of the Government Program in submitting that loan.

81.     Defendant, however knowingly and/or recklessly caused to be made or used false records or statements, including for example the false certifications and representations of compliance with the Government Programs which Defendant caused to be made in connection with its participation in the Government Programs and/or when it submitted loans for insurance and/or for payment or reimbursement.

82.     Defendant engaged in pervasive and systematic efforts to increase its profits by submitting or causing to be submitted to the Government claims for payment and reimbursements in connection with the Government Programs that the Government, upon information and belief, would not have made but for Defendant's false certifications of compliance with the requirements of the Government Programs.

83.     Defendant's failure to comply with the requirements of the Government Programs extends, upon information and belief, to each of Defendant's locations as part of Defendant's efforts to maximize its profits.

84.     Defendant's failure to comply with the requirements of the Government Programs was, upon information and belief, caused and communicated by Defendant's management and managers to underwriters and other employees and staff company-wide.

85.     Defendant engaged in a regular practice of reckless origination and

underwriting of its loans and falsely certified and represented to the Government that loans were eligible for participation in the Government Programs.

86.     The quality of Defendant's loans was affected by Defendant's practices, including lax and inconsistent underwriting standards and controls, pressure and directives to underwriters to violate or avoid requirements and standards of the Government Programs, Defendant's failure to provide sufficient training to its staff, Defendant's use of unqualified individuals to underwrite loans, Defendant's failure to properly process and close loans, Defendant's failure to undertake proper and sufficient quality control processes, and others.

87.     Defendant's management was aware, or should have been aware, that such practices resulted in the endorsement of loans for participation in the Government Programs that did not comply with applicable standards and requirements.  Defendant's management, however, failed to take effective action to address deficiencies in its loan origination and underwriting practices.   Instead, Defendant reaped profits by certifying that its entire portfolio of loans met the applicable standards and requirements and was therefore eligible to participate in Government Programs.  As a result of Defendant's loan certifications, the Government has suffered damages as a result of defaulted loans participating in Government Programs when Defendant knew, or should have known, those loans did not meet the applicable standards and requirements and were ineligible to participate in Government Programs.

88.     Defendant abused its Direct Endorsement Lender status through its false and fraudulent certifications to the Government.  As a Direct Endorsement Lender, Defendant regularly violated applicable standards and requirements, prudent underwriting practices, and Defendant's duties to the Government by failing to conduct proper due diligence on

mortgages that it reviewed and approved for participating in the Government Programs and by failing to comply with applicable quality control standards and requirements. Despite its repeated violations of applicable standards and requirements, Defendant falsely certified, both annually and on a loan-by-loan basis, that it had complied with those standards and requirements, and that that the mortgages it endorsed were eligible. Upon information and belief, had the Government known that Defendant's mortgage eligibility certifications were false, the Government would not have permitted Defendant to endorse those loans, nor would it have permitted Defendant to maintain its status as a Direct Endorsement Lender.

*Defendant's Reckless, Negligent and/or Grossly Negligent Underwriting Practices*

89.     Contrary to Defendant's certifications and representations to the Government that it complied with requirements of the Government Programs, as well as the individual certifications appearing on each and every mortgage endorsed by Defendant, Defendant engaged in reckless, negligent, and grossly negligent underwriting practices in violation of applicable standards and requirements.

90.     Defendant knew or should have known that its certifications of compliance were false. In the alternative, in falsely certifying compliance, Defendant acted with deliberate ignorance and/or reckless disregard of the truth. In the alternative, Defendant's false certifications, as well as its failure to implement proper underwriting practices and procedures, were reckless, grossly negligent and/or negligent.

91.     Defendant's false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of Government Program standards and requirements, violated Defendant's fiduciary obligations and duty of care to the Government.

92.     The underlying causes of Defendant's loan quality issues include Defendant's

emphasis and pressure on underwriters to approve as many loans as possible, at as high a rate as possible, churning out loans at a rapid pace that were then passed on to the Government.

93.     Defendant put heavy pressure on underwriters to approve loans, and not to decline or pend any loan.

94.     Underwriters were repeatedly told it was their job to find a way to "make it work," regardless of the dictates of program requirements; to "interpret" the file in a way that would permit approval; and to "use your imagination" to find a way to approve a loan.  The emphasis was not on finding a way to make the most appropriate decision, but instead to rapidly find any way to get a file approved.

95.     Underwriters were instructed to ignore the express requirements and standards of Government Programs and to instead focus on the "strength of the file."  For example, managers made comments to underwriters to the effect that, where a borrower had a strong FICO score, the underwriter should undertake a more cursory review than a full underwrite.

96.     Managers would direct underwriters to approve questionable loans because it was unlikely that any particular loan would be audited, often noting that they could "fight it" if the loan were audited.  For example, a manager who oversaw production of retail and wholesale loans made comments to the effect of, "Let's play roulette and fix it if they catch us," or "Close it now and fix it later," even though there were no procedures in place for later follow up and, in fact, the loans closed without fixing outstanding issues.

97.     Underwriters were not reprimanded for approving loans, but those who did not approve loans were called in for one-on-one sit down meetings with management.

98.     Managers openly mocked and ridiculed underwriters who did not approve loans to other underwriters.  Underwriters who found ways to approve difficult loans, on the

other hand, would be recognized with an "Above and Beyond" award from senior management.

99.   Managers told underwriters they were simply passing on the pressure received from higher levels of management, based upon internal reports regarding underwriter activity.

100.   Defendant tracked individual underwriters' rates of decisioning, approving, pending and declining loans.  Each month underwriters were given reports showing their own rates as well as those of other underwriters.

101.   If an underwriter failed to approve a loan because it did not meet the appropriate guidelines, management could still find ways to approve the file, either by passing the loan to a different underwriter or by a manager overturning the decision and approving the loan.

102.   Defendant's managers openly mocked the risk department to underwriters, and encouraged underwriters to ignore that department.  When managers did not agree with rules or guidelines put forth by the risk department, or when they wanted underwriters to ignore one of those directives, they would state to the effect that the directives were not important and/or were "stupid."  Similarly, when managers did not agree with the guidelines put forward by an agency, including for example HUD, they would say the guideline was "stupid" or did not make sense.  These statements are another example of managers pressuring underwriters and insisting that they approve loans that did not meet guidelines.

103.   In addition to facing heavy pressure to approve loans, underwriters also were pressured to underwrite as many loans as quickly as possible, which necessarily meant files were not being appropriately reviewed and, thus, approvals granted not because of compliance with program requirements but because of Defendant's pressures on

underwriters. Managers required that each underwriter complete a minimum number of loans each day, but the numbers set made it difficult for underwriters to complete their work during the workday. These numbers did not include additional work required of underwriters, such as reviewing loans that were re-submitted to underwriting, such as re-submissions of loans in a pend status.

104. Additionally, underwriters were incentivized to complete additional loans outside of the workday and during weekends.

### Defendant Failed to Conduct Due Diligence in Accordance with Applicable Standards and Requirements

105. Contrary to Defendant's certifications and representations to the Government, as well as the individual certifications appearing on each and every mortgage endorsed by Defendant, Defendant failed to conduct due diligence in accordance with applicable standards and requirements as well as sound and prudent underwriting principles.

106. Defendant knew or should have known that its certifications of compliance were false. In the alternative, in falsely certifying compliance, Defendant acted with deliberate ignorance and/or reckless disregard of the truth. In the alternative, Defendant's false certifications, as well as its failure to conduct proper due diligence, were reckless, grossly negligent and/or negligent.

107. Contrary to Defendant's certifications and representations to the Government, Defendant failed to adhere to the required minimum standards of due diligence as required by the Government Programs for underwriting mortgages.

108. Defendant's false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of applicable standards and requirements, violated Defendant's fiduciary obligations and duty of care to the Government.

109.   Defendant employed a wide range of strategies and efforts to avoid compliance with the Government Programs, in violation of its certifications to the Government.

110.   Contrary to Defendant's certifications and representations to the Government, Defendant failed to exercise the minimum standards of due diligence to verify information as required by the requirements of the Government Programs.   The instances set forth herein are non-exhaustive examples of some of those activities.

111.   When the automated system determined, based upon Defendant's data entry, that a loan was acceptable, underwriters were required to approve that loan rather than applying their own judgment and discretion, even in instances where the underwriter's experience suggested that the automated system should not have approved the file. Underwriters were told that they did not need to worry about approving those loans because it had passed the automated system and therefore the underwriter's individual DE number was not on the line.

112.   On the other hand, when the automated system did not approve a loan, Defendant found numerous ways to manipulate the system, in violation of applicable standards and regulations, for purposes of approving the loan.

113.   Managers would "adjust" data entered into the system, including for example income or asset values.

114.   In the period of time after Defendant began using the Government's automated system, managers and/or underwriters would adjust and re-run loans that had been referred and, therefore, should have been subject to manual underwriting.

115.   In some instances when the automated system for one Government Program referred a loan for more stringent manual underwriting, Defendant would instead submit the

same loan for automated review to a different Government Program, which could result in an approval (rather than a refer) from the second program. In these instances, Defendant knew that issues with the file suggested further review and underwriting was appropriate, but Defendant ignored that knowledge and instead simply processed the loan as though it had not previously been referred.

116. Where underwriters raised issues or concerns with managers, the managers effectively trained the underwriters to ignore applicable standards and regulations by directing the underwriter to overlook or ignore a requirement and instead assuring the underwriter that, for example, "HUD allows that." Underwriters often conveyed these instructions to each other informally, resulting in lax approaches being applied to numerous loans.

117. Where an underwriter identified issues with a particular file, underwriters were encouraged and pressured to conditionally approve the loan, rather than pending the loan until the issues could be corrected. Underwriters were further incentivized to approve, rather than pend, loans because when a pended loan would later be returned to the underwriter for additional review it did not count toward the underwriter's required daily minimum processing requirements, and made it even more difficult for the underwriter to complete his or her work.

118. When an underwriter approved a loan subject to certain conditions, the required conditions were often waived by an underwriting manager, or by loan processors or their managers.

119. Even where the Government Program's automated system required certain conditions for approval, those conditions were waived, rather than satisfied, prior to closing.

120. Additionally, loan processors who were permitted to clear conditions often permitted loans to close where the conditions had not been satisfied.

121. In some instances, the loan processor, who was not trained regarding requirements of the Government Programs, would fail to adequately check that the documentation provided in fact supported the condition. For example, if a condition required an additional pay stub to confirm income, the loan processor would clear the condition upon receipt of the additional pay stub even where that document showed a significant decrease in income and, therefore, did not actually satisfy the condition.

122. In other instances, the loan processor would simply clear the condition even where the required documentation was in the file and the condition had not been met.

123. Loan processors and underwriters were not permitted to speak with each other or discuss the conditions required by the underwriter and cleared by the loan processor.

124. Additionally, sales managers were permitted to clear or waive conditions, including overriding conditions put into place by the underwriter.

125. Underwriters often complained that they were putting a condition on a file but knew it would be waived without being properly satisfied.

126. With respect to certain forms required by the Government Programs, including for example page 4 of HUD Form 92900-A, underwriters were required to sign but not date the form, confirming that the underwriter had reviewed all closing documentation, including the Note, Mortgage, Title, HUD-1 Settlement Statement, and any conditions required at closing. The date was then inserted at closing. In fact, however, the underwriter did not see all closing documentation because some of that documentation (for example, conditions required at closing) would be obtained only after the underwriter had decisioned the file and

the underwriter would not subsequently review the file.  When underwriters complained that the form should properly be signed by someone at the closing who did, in fact, review all documentation, Defendant instructed the underwriters to sign but not date the form as directed.

127.    Defendant also instructed and required underwriters to undertake a range of strategies to approve loans that circumvented or violated the applicable standards and regulations.  The following are some non-exhaustive examples of the wide variety of strategies employed.

128.    Defendant would approve loans where proper verification had not been obtained.  For example, income would be inflated by including a second job that did not qualify and/or had not been properly verified; income would be inflated by "grossing up" certain nontaxable income without proper verification.

129.    Defendant's duty of due diligence required, *inter alia*, that Defendant take into account all relevant and available information. Defendant, however, frequently chose to ignore unfavorable information and/or to "lose" paperwork indicating that additional underwriting or conditions should be undertaken prior to approving a loan.

130.    For example, due to the risk associated with a borrower who is self-employed, additional documentation and due diligence is required to mitigate that risk.  However, where a borrower's verification of employment indicated that the borrower was self-employed (based upon, for example, the borrower's job title or the fact that the individual providing the verification shared a last name with the borrower), Defendant permitted the borrower to substitute a "new" verification that no longer included that information.

131.    Where Defendant obtained additional information that was not required for

underwriting purposes, such as for example additional tax returns, Defendant would ignore and fail to take into account additional issues indicated by that paperwork, including for example alimony or child support obligations that the borrower had failed to disclose.

132.    Where a second credit report run prior to closing indicated that a borrower's credit score had dropped since the initial application and approval, Defendant would intentionally ignore the poor credit report and instead rely on the earlier, no longer accurate, credit report.

133.    Defendant failed to obtain complete and proper documentation for overtime or bonuses for the required length of time.

134.    For a significant period of time, Defendant instructed underwriters that they were not to contradict the word of the borrower and, therefore, where a borrower provided a letter setting forth relevant information the underwriter was not permitted to question that information or to obtain proper verification of the information.  For example, underwriters were required to accept letters confirming the borrower's rental obligations even where the "landlord" was the borrower's parent.  As another example, where the borrower indicated that he or she was eligible for a second FHA mortgage based on an increase in family size, the underwriter was required to accept a letter stating that the borrower had additional children since the first loan rather than requiring proper documentation verifying that information.

135.    Defendant failed to decline loans or obtain required documentation in instances where the property title included gas rights.  Even where the existence of gas rights was only discovered at closing, and the underwriter attempted to decline the loan at that time, a manager would allow the loan to close without obtaining required documents.

136.    Defendant failed to properly include the cost of required repairs in the amount

of cash required to close.   Even where underwriters attempted to require a showing of adequate cash to close as a condition, managers said that requirement was "easy to waive."

137.   Defendant's managers forged underwriters' signatures on files.   In some instances, the manager would make a change to the file and sign as though the underwriter had made or approved the change when, in fact, the underwriter was not even aware of the change.   In at least one instance, Relator learned that her "signature" had been used to approve a loan that she, in fact, had never underwritten or approved.

138.   Defendant, improperly and in violation of the requirements of the Government Programs, sought and obtained additional appraisals for purposes of obtaining a higher value on a property.   Defendant failed to disclose or properly document these instances, but instead simply ignored the first, unfavorable appraisal.

139.   Defendant avoided the requirements intended to exclude property "flipping" from participation in Government Programs by manipulating or changing sales contract dates and/or by having borrowers resubmit applications to obtain different dates.

140.   Defendant failed to properly identify loans that were subject to additional requirements because they involved, for example, new construction or loans that included grant funds.

141.   Defendant violated Government Program requirements and regulations regarding mortgage insurance rates by failing to charge the insurance rate that had been disclosed to the borrower.   Instead, where the rate increased after disclosure, Defendant would simply charge the higher rate.   In directing employees, one of Defendant's managers said they should do this and just "hope we don't get caught."

142.   Defendant engaged in a variety of other strategies and specific instances of

avoiding, subverting and violating the standards and requirements of the Government Programs.

*Defendant Failed to Employ Properly Qualified and Adequately Trained Underwriters*

143.   Contrary to Defendant's certifications, including the individual certifications appearing on each and every mortgage endorsed by Defendant, Defendant failed to ensure that its underwriters were properly qualified and adequately trained to process loans in connection with the Government Programs.

144.   Defendant failed to provide its underwriters with adequate training regarding the proper standards and requirements in connection with processing Government Program loans.

145.   Additionally, on various occasions Defendant hired or promoted unqualified individuals to positions where they were responsible for underwriting loans for the Government Programs.

146.   In both situations, despite the fact that Defendant knew or should have known that its underwriters were not properly qualified and/or trained with respect to the applicable standards and guidelines, Defendant nonetheless improperly permitted those individuals to underwrite loans in connection with the Government Programs.

147.   Defendant knew or should have known that its certifications of compliance were false.   In the alternative, in falsely certifying compliance, Defendant acted with deliberate ignorance and/or reckless disregard of the truth.   In the alternative, Defendant's false certifications, as well as its failure to conduct proper due diligence, were reckless, grossly negligent and/or negligent.

148.   Defendant's false certifications, as well as its reckless, negligent, and grossly

negligent conduct in violation of applicable standards and requirements, violated Defendant's fiduciary obligations and duty of care to the Government.

149.    Contrary to its annual and individual certifications, Defendant did not comply with applicable standards and requirements by failing to ensure that its underwriters were properly trained and/or qualified with respect to the Government Programs.

150.    On several occasions, Defendant promoted untrained individuals to positions where they would be responsible for underwriting loans in connection with Government Programs before those individuals were properly trained or otherwise prepared to underwrite those loans.

151.    Additionally, in or around 2009, Defendant hired several individuals it believed to be underwriters but who, in fact, had previously been employed in positions where they were not in underwriting loans and, therefore, lacked the appropriate experience. Despite the fact that those individuals were unqualified and insufficiently trained to perform as underwriters, Defendant continued to permit at least some of those individuals to underwrite loans for the Government Programs.

152.    In some instances Defendant "trained" junior underwriters by having them underwrite loans for Government Program that were then to be audited and signed by an experienced manager.  In fact, the manager signed the loans but failed to review the work of the underwriters-in-training.

153.    Upon information and belief, two underwriters who had previously terminated employment with Defendant in connection with a prior audit have been rehired and continue to underwrite loans for Defendant, including those in connection with the Government Programs.

154.   Defendant's underwriters repeatedly complained that they did not receive sufficient training, including in particular training regarding fraud.   Defendant's failure to provide underwriters with information regarding audit findings, as discussed further below, further prevented underwriters from gaining useful information and experience that would assist them in increasing and approving compliance with applicable standards and requirements.

155.   Defendant failed to provide underwriters with the requirements of the Government Programs and instead provided guidelines that incorporated Defendant's own "overlays."

156.   Defendant never distributed to its underwriters mortgagee letters with new, updated requirements and regulations regarding the Government Programs.   Instead, Defendant's underwriters often learned of changes only when Defendant hired new staff who had been properly trained elsewhere.

157.   As one example of the effects of Defendant's failure to provide adequate training, several of Defendant's underwriters said they did not know that FHA required verification of earnest money to approve a loan where the earnest money deposit exceeds 2% of the sales price.

*Defendant Failed to Comply With Quality Control Requirements*

158.   Contrary to Defendant's certifications, including the individual certifications appearing on each and every mortgage endorsed by Defendant, Defendant failed to ensure proper quality controls in accordance with applicable standards and requirements as well as sound and prudent underwriting principles.

159.   Defendant knew or should have known that its certifications of compliance

were false. In the alternative, in falsely certifying compliance, Defendant acted with deliberate ignorance and/or reckless disregard of the truth. In the alternative, Defendant's false certifications, as well as its failure to conduct proper due diligence, were reckless, grossly negligent and/or negligent.

160. Defendant's false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of applicable standards and requirements violated Defendant's fiduciary obligations and duty of care to the Government.

161. Contrary to its annual and individual certifications, Defendant did not maintain proper quality controls in accordance with applicable standards and requirements. The following are some examples of Defendant's pattern and practice of failing to conduct proper due diligence.

162. Defendant failed to provide underwriters with information regarding material findings and other issues identified during internal audits, including those that arose in the context of a default or Early Payment Default. This information would have assisted underwriters in avoiding repeated errors and in improving compliance with the standards and regulations set out by the Government Programs.

163. In fact, Defendant's managers told underwriters that Defendant had determined not to provide that information to underwriters, including in particular information about loans that had defaulted, because Defendant did not want underwriters to "tighten up," meaning, for example, strictly adhering to the guidelines, adding conditions Defendant felt were unnecessary, and reviewing loans at a slower pace, all of which would have resulted in the approval of fewer loans.

*Additional Efforts by Defendant to Comply Avoid Applicable Standards and Requirements*

164.    In addition to the foregoing examples, Defendant undertook additional efforts to avoid its duties and requirements under the Government Programs to increase its loan portfolio and profits at the expense of satisfying its fiduciary duties to the Government.   The following are some examples of those additional efforts and practices.

165.    Defendant improperly used the HUD license number for its Buffalo, NY office in connection with loans originated in its Rochester, NY and Ithaca, NY offices.

166.    Defendant knew or should have known its loan officers engaged in fraudulent practices, yet Defendant permitted those loan officers to continue to develop business including loans that were submitted for participation in Government Programs.

167.    Defendant's loan officers coached borrowers, and in some instances processors, on how to provide fraudulent gift documentation.   When a borrower's account reflected a large, unexplained deposit, loan officers instructed borrowers to obtain a gift letter and then withdraw the funds from the account and have a relative hold those amounts.   The relative would then write the borrower a check post-dated to the date of the original deposit, so that the borrower could then re-deposit their own funds and provide proof of receipt of the funds, proof of deposit into the account and donor ability (copy of the cancelled check).

168.    As another example, two of Defendant's loan officers who worked with loan applicants in connection with the Community Revitalization Act ("CRA") were known to engage in blatantly fraudulent practices in an effort to have more of their loans approved. Despite other employees' complaints about these loan officers' activities, Defendant failed to undertake any effort to deter those practices or to prevent the resulting fraudulent loans.

169.    For example, these loan officers would use a single credit reference in connection with multiple files, using white out to change the name to correspond to each file;

submit files that included rental verifications written by the loan officer herself, in her own handwriting; fail to report when there was a grant on a loan so that required asset documentation would not be required; and/or fail to properly document gifts to avoid required documentation.

170.    Defendant also permitted one of its processing managers, whose husband was one of Defendant's loan officers, to use her position to pressure underwriters to approve her husband's loans.  The processing manager also encouraged and even bullied the processors she supervised into accepting conditions that did not comply with the underwriter's approval condition.

### Defendant's False Certifications Damaged the Government

171.    Upon information and belief, the Government has paid thousands in insurance claims and other expenses relating to mortgages that participated in the Government Programs as a result of Defendant's false annual and/or individual certifications.  Upon information and belief, the Government would not have incurred these expenses absent Defendant's false certifications.

172.    For example, as of March 2013, HUD has paid millions in FHA insurance claims and related costs arising out of Defendant's approval of mortgages for FHA insurance. HUD can additionally expect to pay millions of dollars in further FHA insurance claims as additional mortgages approved by Defendant default in the coming months and years.

173.    Defendant's false certifications were material and bore upon the likelihood that borrowers would make mortgage payments.

174.    The Government has therefore been damaged by Defendant's false claims and certifications.

## FIRST CAUSE OF ACTION
### *For Damages and Penalties Under the False Claims Act*
*(31 U.S.C. § 3729(a)(1)(2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))*

175.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

176.   As set forth above, Defendant violated the False Claims Act by, *inter alia*, engaging in a regular practice of reckless origination and underwriting of its loans in connection with the Government Programs and failing to otherwise comply with the standards and requirements of the Government Programs.   Nonetheless, Defendant certified its compliance with the Government Programs generally and with respect to specific mortgages.

177.   Defendant knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made or caused to be made false representations about the quality of its loans and its practices at the time of their sale, insurance or other endorsement to the Government Programs, including that the loans were of investment quality and complied the with the Government Program guidelines, selling guides, purchase contracts and/or other requirements.

178.   Defendant's misrepresentations were capable of influencing and thus were material to the Government's decisions about purchasing, insuring or otherwise accepting such loans.

179.   The Government has incurred losses as a result of Defendant's misrepresentations in the form of paying guarantees to third parties and/or otherwise incurring monetary losses after affected loans defaulted.

180.   Additionally, the Government has incurred losses as a result of accepting loans for participation in the Government Program when the Government would not have

permitted Defendant to participate in those Government Programs at all had it known of Defendant's practices and its failure to follow program requirements.

181.   Treasury funds have been used to purchase or insure Defendant's loans and to reimburse the losses incurred by the Government Programs as a result of paying insurance, guarantees or otherwise after the loans purchased or insurance from Defendant defaulted and/or in connection with loans that the Government would not have permitted to participate in the Government Programs had it known of Defendant's practices and its failure to follow program requirements.

182.   Treasury funds to or in connection with the Government Programs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2), specifically, to prevent disruptions in the ability of mortgage finance.

183.   By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(A), for each of the loans that participated in the Government Programs in violation of the Government Program requirements, Defendant knowingly, or acting in deliberate ignorance and/or in reckless disregard of the truth, presented or caused to be presented a fraudulent claim for payment or approval.

184.   Pursuant to the False Claims Act, 31 U.S.C. § 3728(a)(1), Defendant is liable to the Government under treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each false or fraudulent claim, plus three (3) times the amount of damages which the Government sustained because of Defendant's actions.

## SECOND CAUSE OF ACTION
### *For Damages and Penalties Under the False Claims Act*
### *(31 U.S.C. §3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))*

185.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

186.   As set forth above, Defendant knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made or caused to be made false representations about the quality of its loans and its practices at the time of their sale, insurance or other endorsement to the Government Programs, including that the loans were of investment quality and complied the with the Government Program guidelines, selling guides, purchase contracts and/or other requirements.

187.   Defendant's misrepresentations were capable of influencing and thus were material to the Government's decisions about purchasing, insuring or otherwise accepting such loans.

188.   The Government has incurred losses as a result of Defendant's misrepresentations in the form of paying guarantees to third parties and/or otherwise incurring monetary losses after affected loans defaulted.

189.   Additionally, the Government has incurred losses as a result of accepting loans for participation in the Government Program when the Government would not have permitted Defendant to participate in those Government Programs at all had it known of Defendant's practices and its failure to follow program requirements.

190.   Treasury funds have been used to purchase or insure Defendant's loans and to reimburse the losses incurred by the Government Programs as a result of paying insurance, guarantees or otherwise after the loans purchased or insurance from Defendant defaulted and/or in connection with loans that the Government would not have permitted to

participate in the Government Programs had it known of Defendant's practices and its failure to follow program requirements.

191.   Treasury funds to or in connection with the Government Programs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2), specifically, to prevent disruptions in the ability of mortgage finance.

192.   By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(A), for each of the loans that participated in the Government Programs in violation of the Government Program requirements, Defendant knowingly, or acting in deliberate ignorance and/or in reckless disregard of the truth, presented or caused to be presented a fraudulent claim for payment or approval.

193.   Pursuant to the False Claims Act, 31 U.S.C. § 3728(a)(1), Defendant is liable to the Government under treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each false or fraudulent claim, plus three (3) times the amount of damages which the Government sustained because of Defendant's actions

### THIRD CAUSE OF ACTION
#### *Violations of FIRREA*

194.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

195.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false individual loan certifications stating that loans were eligible for participation in Government Programs and that Defendant had complied with other requirements including maintenance of data integrity and/or due diligence.   Defendant submitted such false certifications using the mails and/or the wires in violation of 18 U.S.C. §§ 1001, 1006, 1014, 1341, and 1343.   Further, as part of Defendant's scheme to avoid

informing the Government of the loan quality problems it was experiencing and to avoid requests by the Government for indemnification on individual loans, Defendant knowingly made numerous material fraudulent representations to the Government using the mails and/or the wires in violation of 18 U.S.C. §§ 1001, 1006, 1014, 1341, and 1343.

196.   Defendant made these statements to the Government with respect to the loans that it recklessly originated and underwrote, and with respect to the loans that Defendant failed to self-report, with the intent to defraud or deceive the Government into endorsing loans that were ineligible for participation in the Government Programs, and to defraud or deceive the Government into paying insurance claims for loans that were not eligible for insurance.

197.   Accordingly, Defendant is liable to the Government for civil penalties as authorized under 12 U.S.C. § 1833a, in the amount of up to the greater of (i) $1 million per violation, (ii) the amount of loss to the United States, or (iii) the amount of gain to Defendant.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a.   A judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the False Claims Act;

b.   A judgment against Defendant for a civil penalty of $10,000 for each of Defendant's violations of the False Claims Act;

c.   That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.   That Relator be awarded all reasonable attorneys' fees in bringing this action;

e. That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f. That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g. That a trial by jury be held on all issues so triable;

h. An award of pre-judgment interest; and

i. Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated:   March 19, 2013

THOMAS & SOLOMON LLP

By:   _____

J. Nelson Thomas, Esq.
Michael J. Lingle, Esq.
Annette M. Gifford, Esq.
*Attorneys for Relator*
693 East Ave
Rochester, New York 14607
Telephone: (585) 272-0540