**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. KEISHA KELSCHENBACH, | Civ. Action No. 13-cv-0280 |
| Plaintiffs, | |
| v. | **DECLARATION OF ROBERT A. MAGNANINI IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS PURSUANT TO 31 U.S.C. § 3730(d)(1)** |
| M&T BANK CORP., | |
| Defendant. | |

I, Robert A. Magnanini, of full age, being duly sworn, deposes and states as follows:

1.      I am a member of the Bar of this Court and Managing Partner at the law firm of Stone & Magnanini LLP in Berkeley Heights, New Jersey ("S&M"), attorneys for three Movant-Intervenors ("SDNY Relators") who are seeking to recover a portion of the attorneys' fees and costs as a prevailing party under the False Claims Act, 31 U.S.C. § 3729, et seq., deriving from the United States Government's settlement with M&T Bank Corporation ("M&T Bank") entered on May 6, 2016. I submit this Declaration in support of the SDNY Relators' Motion for Attorneys' Fees and Costs Pursuant to 31 U.S.C. § 3730(d)(1).

2.      **Exhibit 1** to this declaration is a true and correct copy of the complaint from the related SDNY Action.

3.      **Exhibit 2** to this declaration submitted *in camera* contains the detailed descriptions of and charges for the legal services provided by individuals in my firm in litigating the SDNY Action and this case.  The time records were contemporaneously maintained and are true and accurate.

4.      I have carefully reviewed this fee submission and have exercised billing judgment to ensure that none of the time for which reimbursement is sought is excessive, redundant, or otherwise unnecessary, and to ensure that all fees and costs incurred are reasonable.

5.      A true and correct copy of a synopsis of hours spent and fees and costs incurred is annexed hereto as **Exhibit 3**.

## QUALIFICATIONS OF STONE & MAGNANINI LLP PERSONNEL WHO HAVE BILLED TIME ON THIS MATTER

6.      To provide further justification for S&M's requested fees, I set forth below the qualifications and biographical information of each S&M attorney or paralegal who has billed time on this matter – and for which S&M requests a fee award.

### *DAVID STONE, SENIOR MANAGING PARTNER*

7.      David Stone is the Senior Managing Partner of S&M.

8.      Mr. Stone graduated from Harvard Law School in 1984, where he was an assistant to Professors Laurence Tribe and Alan Dershowitz.

9.      Mr. Stone is licensed to practice law in the States of New York (1988), New Jersey (1987), and the Commonwealth of Massachusetts (1985).  Mr. Stone is also licensed to practice in the United States Supreme Court, the United States Courts of Appeals for the Second, Third and Fourth Circuits, and the Federal courts in the District of New Jersey, Southern, Northern, and Eastern Districts of New York, the District of Massachusetts, and the District of Minnesota.  Finally, Mr. Stone is admitted in the United States Court of Federal Claims.

10.      Prior to forming S&M, Mr. Stone was the head of the New Jersey office of Boies, Schiller & Flexner, LLP, where he was involved in large fraud and complex litigation cases, including recapturing the New York Yankees' television rights alongside renowned trial lawyer

David Boies; securing a $10 million patent infringement jury award against industry giant AOL; and arguing a seminal war fraud case before the United States Supreme Court.

11.     Mr. Stone has also participated in multiple high-profile lawsuits against AIG and its former directors and he has served as co-counsel in Starr International's lawsuits against the U.S. Treasury and the New York Federal Reserve arising out of the 2008 AIG bailout.  Recently, Mr. Stone represented the U.S. Virgin Islands in a lawsuit for damages arising out of a failed tax free bond issue case as well as a major military contractor and former head of the Williams Morris Agency in complex fraud cases.

12.     Mr. Stone's long experience representing relators in False Claims Act cases has included some of the largest recoveries in history: Medco ($165 million), Bristol Myers Squibb ($425 million), Cephalon ($350 million), McKesson ($360 million), Janssen ($2.2 billion), and GlaxoSmithKline ($3 billion). Currently, Mr. Stone is handling numerous False Claims Act cases venued throughout the country, both sealed and unsealed, in areas from health care to education to defense contracting.

13.     Additionally, Mr. Stone served as the General Counsel for the YankeeNets organization from 2004 to 2006.

14.     Mr. Stone is AV® Preeminent™ Peer Review Rated by Martindale-Hubbell®, and has been named a "Super Lawyer" by the Thompson Reuters publication.

15.     Mr. Stone's hourly rate for this litigation was $800 in 2013, $820 in 2014 through 2016, and $850 in 2017.

### *ROBERT MAGNANINI, MANAGING PARTNER*

16.     I, Robert Magnanini, am a Managing Partner of S&M.

17.     I received my law degree from Columbia University School of Law in 1993, where I received the designation as a Fellow of the Tony Patino, Jr. Fellowship, and a Governor Robert B. Myner Scholar, was awarded the Whitney North Seymour Medal for Excellence in Trial Advocacy, and was the Student Speaker at Commencement.

18.     I am licensed to practice law in the Supreme Court of the United States, the United States Courts of Appeals for the Second, Third, Fourth and Fifth Circuits, the United States District Courts for the District of New Jersey, Eastern and Middle Districts of Pennsylvania, Southern, Eastern, Northern and Western Districts of New York, the Federal Court of Claims, and the State of New York (1994), State of New Jersey (1993), Commonwealth of Pennsylvania (1993), and the District of Columbia (2010).

19.     I have extensive experience in prosecuting and defending complex civil and criminal matters. I have tried, arbitrated and mediated cases in federal and state courts and before numerous administrative bodies. I spearheaded several large internal investigations which resulted in parallel civil and criminal proceedings and I have handled difficult appellate matters. For example, I was appointed to complete Michael Chertoff's tenure as the Investigations Officer of the Mason Tenders Union to conclude the investigation into associations with organized crime after former Department of Homeland Security Secretary Chertoff was appointed as the Assistant United States Attorney General for the Criminal Division.

20.     I have also prosecuted numerous RICO actions and defended corporations and individuals in securities fraud class actions. I have litigated a large variety of commercial matters including professional malpractice, institutional asset recovery, banking issues, minority shareholder actions, construction and commercial real estate actions and intellectual property matters for companies such as AOL, AT&T, Donaldson, Lufkin & Jenrette (now CSFB),

4

DuPont, Foodtown, Ford Motor Company, Lucent, MobileMedia, Sears, Siemens Microelectronics, Tosco Corporation, Vivendi and Zenith. My work in the environmental area has focused primarily on defending and prosecuting federal and state cost recovery actions, regulatory and enforcement actions and corporate successor liability and dissolution issues for companies such as Atlantic Express, Baker & Taylor, International Paper Company, International Truck and Engine, Monsanto, Sears and Solutia.

21.     I have prosecuted and defended a variety of product liability actions involving toxic tort, personal injury and property damage claims for companies such as AT&T, International Paper Company, Monsanto, Sears and Rubbermaid.

22.     I have also worked extensively on a number of False Claims Act cases, having worked hand-in-hand with David Stone on the matters discussed above. I currently serve as lead counsel on several under seal FCA cases being investigated throughout the United States as well as for cases being investigated by the IRS and SEC.

23.     Prior to forming S&M, I was a partner at Boies, Schiller & Flexner LLP.

24.     My hourly rates for this litigation were $675 in 2013 and 2014, $695 in 2015 and 2016, and $720 in 2017.

### *DAVID HARRISON, PARTNER (FORMER)*

25.     David Harrison was formerly a partner with S&M. Mr. Harrison left the firm in April 2016. Mr. Harrison is now a partner at Spiro Harrison.

26.     Mr. Harrison is a 2007 graduate of Brooklyn Law School. While in law school, Mr. Harrison served as a judicial intern for Chief Magistrate Judge Steven M. Gold of the United States District Court for the Eastern District of New York, and as a legal intern for the Office of the Bronx District Attorney.

27.     Mr. Harrison is licensed to practice law in the States of New York (2009) and

New Jersey (2008), the United States Supreme Court, the U.S. Court of Appeals for the Third

Circuit, the U.S. District Court for the District of New Jersey, and the U.S. District Courts for the

Southern, Eastern, and Western Districts of New York.

28.     Following his graduation from law school, Mr. Harrison was employed as an

Associate at Bernstein Liebhard LLP in New York City.  From there, Mr. Harrison joined S&M

in May 2012.  He was named a partner at S&M in December 2015.

29.     Mr. Harrison practices in complex litigation.  He has successfully represented

both Plaintiffs and Defendants in a wide variety of commercial litigation in both federal and state

court including contractual disputes, business torts, antitrust, securities litigation, intellectual

property, and employment matters at the trial and appellate levels.  His clients have included

small business owners, corporations, state agencies, state pension funds, and financial

institutions, among others.

30.     Mr. Harrison also has extensive experience consulting on matters involving False

Caims Act litigation and the SEC and IRS whistleblower provisions.  His matters have included

major cases in the financial, pharmaceutical, and government contracting sectors.

31.     Mr. Harrison's hourly billing rates while at S&M were as follows: $450 in 2013

and 2014, and $475 in 2015 and 2016.

### *ALEX BARNETT-HOWELL, ASSOCIATE*

32.     Alex Barnett-Howell is an Associate with S&M.

33.     Mr. Barnett-Howell graduated from the University of Michigan Law School, *cum*

*laude*, in 2014.

34.     While in law school, Mr. Barnett-Howell interned with the Kings County District Attorney's Office—Medicaid Fraud Bureau, the Criminal Appellate Practice Clinic at the University of Michigan Law School, and the Wisconsin Innocence Project.

35.     Mr. Barnett-Howell is licensed to practice law in the State of New York (2015), the United States District Courts for the Southern and Eastern Districts of New York, the State of New Jersey (2015), and the United States District Court for the District of New Jersey.

36.     As an Associate with S&M, Mr. Barnett-Howell handles complex commercial litigation matters, including intellectual property issues, antitrust claims, and *qui tam* actions. Mr. Barnett-Howell represents individual and institutional clients in federal and state court at all stages of litigation. Mr. Barnett-Howell is responsible for investigating claims, drafting complaints, researching and drafting appropriate briefing and motions, and filing appeals in federal and state courts. Mr. Barnett-Howell has represented relators under the federal, state, and local False Claims Acts, and whistleblowers under the Dodd–Frank Wall Street Reform and Consumer Protection Act. Mr. Barnett-Howell has successfully litigated claims against national and international companies, including major health care providers, defense contractors, and financial institutions. Mr. Barnett-Howell has also negotiated compliance protocols with federal and state authorities on behalf of corporate institutions.

37.     Mr. Barnett-Howell's hourly billing rates with the firm were $300 in 2013, $350 in 2014 through 2016, and $375 in 2017.

### *BRADFORD MULLER, ASSOCIATE*

38.     Mr. Muller is a graduate of Seton Hall University School of Law, *magna cum laude*, in 2009, where he was a Comments Editor on the *Seton Hall Law Review*.

39.     Mr. Muller is licensed to practice law in the State of New York (2010), the State of New Jersey (2009), the United States District Court for the District of New Jersey, and the District of Columbia (2010 – license currently inactive).

40.     Following his graduation from law school, Mr. Muller completed a one-year judicial clerkship with The Honorable Anthony J. Parrillo – a judge of the Superior Court of New Jersey, Appellate Division.

41.     After his clerkship, from September 2010 through July 2013, and again from November 2015 to December 2016, Mr. Muller was a Litigation Associate with the law firm Norris McLaughlin & Marcus, P.A. ("NMM"), which has offices in New York City, New Jersey, and Pennsylvania.  Mr. Muller was responsible for handling all aspects of the firm's commercial litigation while associated with NMM, including drafting complaints, researching and drafting appropriate briefing and motions, and filing appeals in federal and state courts.

42.     From July 2013 through November 2015, Mr. Muller was employed by the State of New Jersey, Office of the Attorney General.  Specifically, Mr. Muller was a Deputy Attorney General with the Division of Criminal Justice–Office of the Insurance Fraud Prosecutor, where he led a trial team that was responsible for the investigation and criminal prosecution of insurance fraud and other related financial crimes in the State of New Jersey.

43.     Since December 2016, Mr. Muller has been an Associate with S&M.  Again, Mr. Muller is responsible for handling all aspects of the complex commercial litigation that our firm undertakes, including False Claims Act cases.

44.     Mr. Muller has received various awards as an attorney, including a Commendation Award from the National Insurance Crime Bureau, an Attorney General's Award

for Excellence, and Mr. Muller was also named a "Rising Star" in New Jersey by the Thompson Reuters "Super Lawyers" publication in 2013 and 2017.

45.     Mr. Muller's billing rate since joining S&M has been $550.00.

### *TARA SAYBE, PARALEGAL*

46.     Tara Saybe is a paralegal–case manager who joined S&M in October 2013.

47.     Ms. Saybe is a graduate of Moravian College (1993), where she received her B.A. in Criminal Justice.  Ms. Saybe later received her certificate from the ABA-approved paralegal studies program at Fairleigh Dickinson University (1994).

48.     Following her completion of the paralegal program, Ms. Saybe joined Porzio Bromberg & Newman, P.C., in Morristown, New Jersey.  In 1996, Ms. Saybe left the Porzio firm and joined Hannoch Weisman, P.C., in Roseland, New Jersey.

49.     From September 1998 through April 2006, Ms. Saybe was a Senior Paralegal with the international law firm Latham & Watkins, in New York City.

50.     From April 2006 through October 2013, Ms. Saybe was a Paralegal Manager at Patton Boggs LLP (now Squire Patton Boggs).

51.     As a paralegal–case manager with S&M, Ms. Saybe is responsible for handling all administrative and support tasks associated with the firm's various complex commercial litigation cases to which she is assigned.

52.     All told, Ms. Saybe has 23 years of experience as a paralegal at sophisticated law firms undertaking complex civil litigation matters.

53.     Ms. Saybe's hourly billing rates were $200 in 2013, and $225 from 2014 through present day.

## *BRIAN RAWSON, PARALEGAL*

54.     Mr. Rawson is a paralegal who joined S&M in April 2014.

55.     Mr. Rawson is a graduate of Fairleigh Dickinson University, where he received a

B.A. in Political Science and Government.  Mr. Rawson also has relevant certifications,

including: Paralegal Certificate of Mastery (LexisNexis - 2012) and Certified Litigation Support

Professional (LitWorks - 2013).

56.     Prior to joining S&M, Mr. Rawson was a paralegal at Patton Boggs LLP (now

Squire Patton Boggs) from June 2007 through April 2014.

57.     As a paralegal at S&M, Mr. Rawson oversees the electronic discovery lifecycle

and arranges procedures for collections, reviews and productions; collaborates with outside e-

discovery vendors to identify and resolve issues; sets-up and maintains document review and

other litigation databases and helps coordinate document reviews and productions; provides

support to attorneys focusing mainly on federal, state and local false claims act and *qui tam*

litigations, and liaises with Attorneys General and supporting offices to assist in the recovery of

monies lost to fraud.

58.     Mr. Rawson assists S&M's attorneys in all aspects of litigation, from research to

filing, while also providing trial support.

59.     Mr. Rawson's hourly billing rate has been $170 for all times relevant to this fee

application.

## COMPARISON OF S&M RATES AGAINST THOSE OF SIMILARLY SITUATED LAW FIRMS IN NEW YORK

60.     Attached hereto at **Exhibit 4** is a true and genuine copy of the 2015 Billing

Survey from the *National Law Journal*, as discussed at length in the accompanying brief.

61.     The accompanying brief also sets forth, at length, relevant case-law from New

York which demonstrates that S&M's hourly rates are fair and reasonable.

**S&M ALSO SEEKS ITS REASONABLE COSTS INCURRED IN THE UNDERLYING
LITIGATION AND IN THIS FEE APPLICATION**

62.     Attached hereto at **Exhibit 5** is a true and genuine copy of the supporting

documentation for the costs incurred by S&M in litigating both the underlying litigation and this

fee application.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Executed on February 8, 2017

_____

Robert A. Magnanini

11

# EXHIBIT 1

JUDGE SCHOFIELD

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

# 13 CV 7952

UNITED STATES OF AMERICA,

*ex rel.* [UNDER SEAL],

            Plaintiffs,

      v.

[UNDER SEAL],

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT FILED UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)(2)**



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF IOWA, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE COMMONWEALTH OF VIRGINIA, THE CITY OF NEW YORK AND THE DISTRICT OF COLUMBIA, *ex rel.* PATRICK LESTER, MARLENE MILLER, and PAULINE MYERS,<br><br>Plaintiffs,<br><br>v.<br><br>APPRAISAL.COM, APPRAISERS, CHOICE INC., INSURANCE SERVICES, ORGANIZATION, VERISK ANALYTICS, INC., M&T BANK CORPORATION, KEYBANK NATIONAL ASSOCIATION, WASHINGTON MUTUAL INC., JP MORGAN CHASE & CO., NATIONSPOINT, MERRILL LYNCH, BANK OF AMERICA, DOES 1-100,<br>Defendants. | Civil Action No.:_____<br><br><br>**COMPLAINT FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

On behalf of the United States of America, the State of California, the State of Delaware,

the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of

1

Indiana, the State of Iowa, the Commonwealth of Massachusetts, the State of Minnesota, the

State of Montana, the State of Nevada, the State of New Jersey, the State of New Mexico, the

State of New York, the State of North Carolina, the State of Rhode Island, the State of

Tennessee, the Commonwealth of Virginia, the City of New York, and the District of Columbia

(collectively, the "States"), Plaintiff and Relators Patrick Lester ("Lester"), Marlene Miller

("Miller"), and Pauline Myers ("Myers") (collectively, "Relators") file this *qui tam* complaint

against Defendants Appraisal.com, Appraisers Choice Inc., Insurance Services Organization,

Verisk Analytics, Inc. (collectively "Appraisal.com"), M&T Bank Corporation ("M&T"),

KeyBank National Association (KeyBank), Washington Mutual, Inc. ("WaMu"), JP Morgan

Chase & Co. ("JP Morgan"), NationsPoint, Merrill Lynch, Bank of America, Does 1-100,

(individually and/or collectively, the "Banks") alleging the following:

## I.    INTRODUCTION

1.    This is an action to recover treble damages and civil penalties on behalf of the

United States of America and of the States in connection with the defrauding of the United States

Government and the States by several banks and a third-party appraisal company through a

fraudulent appraisal scheme which resulted in the making or the causing to be made of false

claims for payment of mortgage insurance from the federal government on fraudulently created

loans certified by the Banks and backed by the full faith and credit of the United States.

2.    From at least 2004 through the present, the Banks committed widespread

appraisal fraud upon homeowners and the United States Government by fraudulently inflating

residential and commercial property values in order to close loans and improperly secure

insurance from the Federal Housing Administration ("FHA") under the United States

Department of Housing and Urban Development ("HUD") and from government-sponsored

entities ("GSEs") such as the Federal National Mortgage Association ("Fannie Mae"), and the

2

Federal Home Loan Mortgage Association (Freddie Mac"), among others, in violation of federal and state law, including the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA").

3.      The Banks used a third-party appraisal software company, Appraisal.com, to perpetrate a scheme which compromised the entire independent appraisal process explicitly required under federal and state law.

4.      Under this scheme, the Banks routinely directed Appraisal.com to manipulate the appraisal process by: (i) causing appraisers to falsify appraisal documents to conform with certain requirements that would result in obtaining FHA and GSE mortgage approval, (ii) hand-picking pre-selected appraisers from an approved appraiser list for particular appraisals, (iii) black-balling appraisers who would not "play ball" with the fraudulent scheme, (iv) rewarding appraisers who were complicit in the scheme, (v) violating loan-to-value ratio ("LTV") requirements of FHA and the GSEs in furtherance of obtaining approval for unqualified loans, and (vi) unilaterally changing appraisal characteristics including property comparables and appraisal values, among other things, in order to inflate appraisal values and/or get the loan approved for insurance.

5.      FHA and GSE approval guaranteed the payment of the underlying principal on the loans, shifting the risk of borrower default from the Banks, or any subsequent purchaser of the loan, to the federal government. Thus, obtaining such approval was critical as it allowed the Banks to either easily sell the loans to investment banks or to comfortably hold the loans in their own investment portfolios, assured that if the unfit borrower failed to make payment, the Government would be forced to shoulder the burden.

6.      FHA and the GSEs provide strict underwriting guidelines for the origination and issuance of mortgage loans to eligible borrowers. Among those guidelines, including that

3

borrowers meet certain income levels and credit scores depending on the value of the property and the size of the loan, is the requirement that prospective loans meet certain LTV levels. A mortgage LTV is the percentage of the mortgage amount over the appraised value of the property. Depending on a particular borrowers' loan characteristics, the Banks and the federal mortgage insurance programs require that the mortgage amount be a certain percentage of the appraised value of the property, typically 80%. Banks and the federal mortgage insurance programs also have maximum LTVs, generally denying all loans with LTVs above 95%.

7.      Banks and the federal mortgage insurance programs rely heavily on the LTV in making a loan approval determination, in large part, because it provides the strongest measure for the riskiness of the loan and the likelihood of borrower default. The importance placed on this calculation makes an accurate, unbiased appraisal absolutely critical to making a sound decision to issue and insure a loan.

8.      Accordingly, federal and state law explicitly require an independent and unbiased appraisal process. Indeed, any manipulation of the appraisal will have a direct impact on the LTV and thus, the Government's decision to insure a loan. Where the appraisal amount is inflated, the loan will appear on its face more attractive because it lowers the apparent riskiness of the loan by reducing the LTV.

9.      The Banks intentionally inflated appraisals in order to close loans and lower LTVs, fraudulently causing the Government to insure bad loans. Once the loans were insured, the Banks either sold them off or retained them, collecting the monthly payments without concern that the unqualified borrower would eventually fail to make payment.

10.     The Banks' and Appraisal.com's fraudulent manipulation of property values and other appraisal characteristics had a direct impact on both the Banks' determination to issue the

4

loan in the first place, and the Government's subsequent decision to insure the loan.
Consequently, the scheme resulted in the issuance of mortgages to unfit borrowers, a substantial
percentage of which ultimately defaulted.

11.    The subsequent default triggered a request for payment on the Government
insured loan by the bank that owned the loan.  This insurance claim required the bank to make
certain representations about the bona fides of the loan itself, including the accuracy of the
appraised value of the property.  These claims, of course, were false due to the widespread and
pervasive appraisal scheme conducted by the Banks and Appraisal.com.  The Banks and
Appraisal.com caused these false claims to be made in violation of the FCA.

12.    As a result of the Banks' and Appraisal.com's fraudulent conduct, tens of
thousands of loans defaulted, resulting in tens of millions of dollars in damages to the United
States when false claims were paid for government mortgage insurance through FHA and the
GSEs.  The Banks are liable to the Government for each and every defaulted loan for which
claims for Government insurance were made, either by the Banks or by subsequent purchasers of
the loans.

13.    Moreover, FHA and GSE guidelines require lenders, including the Banks, to
certify compliance in the origination and issuance of each loan submitted.  In addition, the Banks
must certify compliance with certain quality control measures instituted by FHA and the GSEs as
a condition for participating in these government mortgage insurance programs.  Each time the
Banks certified compliance with FHA and GSE guidelines, they also committed a violation of
the FCA.

5

14.     Many States, including state pension funds, were also damaged by the appraisal scheme through investments in mortgage backed securities that contained the Banks' fraudulent loans.

15.     The Banks sold thousands of loans each year to investment banks, like Goldman Sachs, or to the GSEs, which then bundled and securitized those loans in an investment trust and sold the securities to institutional investors like States and state pension funds.

16.     In purchasing the interests in the securities, the States relied on prospectuses issued by the GSEs or by investment banks representing that the securities contained mortgages that followed appraisal guidelines. The prospectuses containing these false statements relied on misrepresentations by the Banks and Appraisal.com that the appraisals were true and accurate assessments of the appraised home for which the mortgages were issued. The Banks and Appraisal.com caused these false statements to be made in the prospectuses in violation of the false claims acts of the States.

17.     When the fraudulent mortgages in those securities failed to perform and/or defaulted, the States suffered substantial losses due to the devaluation of their collapsing investment which contained a significant amount of the Banks' loans. Accordingly, the Banks and Appraisal.com are liable under the false claims acts to the States for the losses suffered as a result of their investment in securities containing the Banks' toxic mortgages.

18.     As the former Chief Appraiser for M&T, Relator Patrick Lester had personal knowledge of widespread appraisal fraud in the residential mortgage division of the bank. He observed on numerous occasions, loan officers pressuring internal and external appraisers to change values on loans for residential subdivision properties, and reported the illegal conduct to supervisors on several occasions. In 2011, Relator Lester was asked to leave the bank after

months of discrimination and retaliatory conduct for, among other things, reporting the appraisal fraud.

19.     Relator Marlene Miller, a former Quality Assurance Representative with Appraisal.com from 2004 – 2006, has personal knowledge of the Banks ordering Appraisal.com to cause appraisers to manipulate various appraisal characteristics, including appraisal values, on appraisals, and was directed on multiple occasions to make such changes herself when appraisers refused to comply.  After having reported these as well as certain other improper practices at Appraisal.com, including the inability of staff to provide proper service to clients due to a serious lack of resources and training, she resigned.

20.     Relator Pauline Myers served in many capacities at Appraisal.com form 2005-2007 allowing her to personally observe numerous violations of appraisal guidelines and fraudulent conduct on behalf of the Banks and Appraisal.com.  She served as a Regional Executive Account Manager, Vendor Development Agent, Quality Assurance Representative, Financing Department staff member, Customer Service Team Leader, and Customer Care Representative.  In each of these capacities, Relator Myers observed improper conduct by both Appraisal.com and the Banks, including the falsification of appraisal data and appraisal values in order to manipulate the true appraised value of the property and to get a loan approved for the Banks.

21.     In sum, the conduct personally observed by the Relators at Appraisal.com, the Banks, and M&T caused the submission of false claims to the Government and the States which were substantially damaged by these false claims act violations.

## II.   JURISDICTION AND VENUE

22.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. § 3729, et seq.

23.    In addition, the FCA specifically confers jurisdiction upon United States District Courts under 31 U.S.C. § 3732.  This court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in the Southern District of New York.

24.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because certain of the acts complained of herein occurred in or affected the Southern District of New York.

25.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and Defendants has sufficient minimum contacts with the United States of America.

26.    In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed in camera and will remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

27.    Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint. Relators have complied with this provision by serving copies of this Complaint upon Preet Baraha, United States Attorney for the Southern District of New York, and upon the Honorable Eric H. Holder, Attorney General of the United States.  Relators also provided substantially all material evidence and material information in their possession to the Office of the United States Attorney for the Southern District of New York at the filing of their Original Complaint.

28.     Relators are not aware that the allegations in this Complaint have been publicly disclosed.  Further, to the extent Relators are aware of any public disclosures, this Complaint is not based on such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relators are an "original source" because they have provided this information voluntarily to the Government before filing this Complaint, and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## III.   THE PARTIES

29.     Relator Patrick Lester is a citizen and resident of the State of New York.

30.     Relator Marlene Miller is a citizen and resident of the State of New York.

31.     Relator Pauline Myers is a citizen and resident of the State of New York.

32.     Relators are each an original witness and/or source and have direct, personal, and independent knowledge of the information upon which the allegations herein are based.

33.     Defendant Appraisal.com was a third-party appraisal services firm headquartered in Buffalo, NY.

34.     Defendant Appraisers Choice, Inc. ("ACI") is an appraisal software company headquartered in Palm Coast, FL.  In November 2008, ACI acquired  all of the assets of Appraisal.com from Zaio Corp. following its purchase of the company earlier that same year.  ACI is a division of Insurance Services Organization.

35.     Defendant Insurance Services Organization ("ISO") is an insurance risk consulting firm headquartered in Jersey City, NJ.  ISO is owned by Verisk Analytics, Inc.

36.     Defendant Verisk Analytics, Inc. is a publicly traded company headquartered in Jersey City, NJ.

37.     Defendant M&T Bank is a New York corporation with its headquarters in Buffalo, NY.

38.     Defendant KeyBank is an Ohio corporation with its headquarters in Cleveland, OH.

39.     Defendant WaMu was a Washington savings bank holding company with its headquarters in Seattle, WA.  In 2008, WaMu went into receivership and the federal government seized all of its asserts.  Shortly thereafter, its banking business, including its residential mortgage divisions, were sold to JP Morgan.

40.     Defendant JP Morgan is a New York corporation with its headquarters in New York, NY.  JP Morgan purchased and assumed the liabilities of Washington Mutual in September 2008.

41.     Defendant NationsPoint was an online direct-to-consumer mortgage lender headquartered in Lake Forest, CA.

42.     Defendant Merrill Lynch is a subsidiary of Bank of America with its headquarters and principal place of business in New York, NY.  In 2006, Merrill Lynch purchased the assets and assumed the liabilities of NationsPoint.

43.     Defendant Bank of America is a North Carolina corporation with its headquarters in Charlotte, NC.  Bank of America affiliate Merrill Lynch purchased and assumed the liabilities of NationsPoint in January 2007.

44.     Plaintiff is unaware of the true names of the defendants sued herein under the fictitious names DOES 1-100, and will seek leave to amend this Complaint to sue such parties by their actual names at such time as plaintiffs become aware of them.

## IV.    GOVERNING LAWS, REGULATIONS AND CODES OF CONDUCT

### A.    The False Claims Act

45.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to

recover losses sustained as a result of fraud against the United States.  Further clarifying

amendments were adopted in May 2009 and March 2010.

46.     The FCA imposes liability upon any person who "knowingly presents, or causes

to be presented [to the Government] a false or fraudulent claim for payment or approval"; or

"knowingly makes, uses or causes to be made or used, a false record or statement material to a

false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false

record or statement material to an obligation to pay or transmit money or property to the

Government, or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A),

(B), (G) (emphasis added).  Any person found to have violated these provisions is liable for a

civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the

amount of the damages sustained by the Government.

47.     Significantly, the FCA imposes liability where the conduct is merely "in reckless

disregard of the truth or falsity of the information" and further clarifies that "no proof of specific

intent to defraud is required." 31 U.S.C. § 3729(b)(1).

48.     The FCA also broadly defines a "claim" as one that includes "any request or

demand, whether under a contract or otherwise, for money or property and whether or not the

United States has title to the money or property, that – (i) is presented to an officer, employee, or

agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money

or property is to be spent or used on the Government's behalf or to advance a Government

program or interest, and if the United States Government – (i) provides or has provided any

portion of the money or property requested or demanded; or (ii) will reimburse such contractor,

grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

49.    The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

50.    The request for payment of insurance claims for losses suffered as a result of defaulted loans where those loans were falsely certified as HUD or GSE compliant constitutes a violation of the FCA. In this action, the Banks and Appraisal.com knowingly and routinely authorized FHA, Fannie Mae, and Freddie Mac loans to unqualified borrowers by falsifying, manipulating, and/or misrepresenting, or causing others to do the same, appraisal documents, and falsely certifying compliance with certain federal underwriting guidelines in violation of federal law. As a result of this illegal conduct, the Banks and Appraisal.com caused the making of tens of thousands of false FHA and other GSE insurance claims amounting to millions of dollars in losses to the Government.

51.    In most material respects for purposes of Relator's claims, the state false claims acts mirror their federal counterpart.

52.    Thus, the requests for payment by investment banks for interests in mortgage related securities to States through prospectuses that contain misrepresentations about appraisal independence, and which are caused to be made by Appraisal.com and the Banks are false claims under these state false claims acts. As a result of the defaulting fraudulent loans in the mortgage

12

backed securities invested in by the States, several States suffered substantial losses when their investments collapsed.

**B.** **Government Funded Residential Mortgage Insurance Program**

53.     In 1934, Congress established FHA under HUD to provide mortgage insurance on loans made by FHA approved lenders throughout the United States.  FHA mortgage insurance provides lenders with protection against losses as a result of a homeowner defaulting on their mortgage loan.  Lenders pay FHA premiums for insurance on the loans and FHA pays claims made by the lender in the event of borrower default.  FHA allows approved lenders to shift the risk to the federal government to encourage lenders to issue more loans to families who may not be able to meet conventional underwriting requirements but who are otherwise creditworthy borrowers.

54.     Accordingly, HUD provides strict underwriting requirements for a loan to qualify for FHA mortgage insurance.  In particular, borrowers must have adequate income to meet the mortgage payments and other obligations associated with the loan.  HUD provides a formula based on the household income of borrowers, the required monthly payments, including interest and taxes, and the appraised value of the property, which determines whether borrowers will be able to meet their payment obligations.  Also, the borrowers must meet a certain level of creditworthiness, demonstrating a consistent pattern of paying off debt.

55.     FHA mortgage insurance allows the owner of an FHA insured loan to submit a claim for payment of any remaining principal on the loan to HUD in the event that the borrower defaults.  Thus, FHA mortgage insurance is critical to any business built around the resale of mortgages to investors because, not only are the loans understood to have legitimately passed through FHA's strict requirements but because they are insured by the federal government.

56.    HUD provides FHA approved lenders, like the Banks, significant authority to

manage and maintain the integrity of its residential mortgage insurance program.  Specifically,

under the direct endorsement lender ("DEL") program, approved lenders certify loans for FHA

insurance themselves, subject to FHA audits, and certify compliance, on a loan by loan basis,

that they have complied with HUD requirements in evaluating the loan and that each loan

qualifies for the FHA insurance program.  Additionally, DELs must certify that the loans

contained accurate, truthful borrower information, were not the product of fraud, that loans were

appropriate to the borrower's qualifications and purposes, and that the borrower has the ability to

repay the loan, as well as certify that they had conducted due diligence and compliance under

FHA program guidelines, including with regard to the appraisals.

57.    In addition to the loan by loan certification, approved lenders are required each

year to certify that they have complied with HUD guidelines in administering the program,

including the maintenance of proper internal quality controls and the exercise of due diligence on

all loans approved for FHA insurance, with respect to underwriting, credit checks, and

appraisals, among other things.

58.    The Federal National Mortgage Association, or "Fannie Mae," purchases and

securitizes loans, converting them into mortgage related securities, in order to increase liquidity

for lenders to reinvest in lending for more home buyers/borrowers in the market.  The Federal

Home Loan Mortgage Corporation, or "Freddie Mac," like Fannie Mae, buys mortgages on the

secondary market, pools the loans, and then sells them as mortgage related securities on the open

market.[1]  Both Fannie Mae and Freddie Mac, like FHA, allow approved lenders to unilaterally

---

[1] Both Freddie Mac and Fannie Mae do essentially the same thing, for essentially the same purpose – to increase
liquidity for banks to encourage more lending. The main difference between the two is that Fannie Mae primarily
buys loans issue by banks while Freddie Mac primarily buys mortgages issued by thrifts – a smaller financial
institution that focuses just on issuing mortgages and taking deposits.

approve borrowers for purchase and insurance through an automated system and to certify

compliance without review or approval by the Government.

59.　　Each of these GSEs, in addition to HUD, suffered substantial losses as a result of

the Bank's and Appraisal.com's fraudulent conduct.　As described in more detail below,

HUD/FHA and the GSEs paid many millions of dollars on potentially thousands of claims made

by investment and commercial banks for non-performing and defaulting loans issued and

supplied to them by the Banks despite being comprised of inflated appraisals with unqualified

borrowers who could not be reasonably expected to repay the loans or had low performance

backgrounds.

**C.　　Appraisal Independence and Loan-to-Value Ratio Requirements of FHA and the GSEs**

60.　　Under 12 U.S.C. § 1709(b)(2)(B), Congress expressly prohibits FHA from

insuring any mortgage in excess of "100 percent of the appraised value of the property." Further,

12 U.S.C. § 1708(g)(1), "appraisals shall be performed in accordance with uniform standards, by

individuals who have demonstrated competence and whose professional conduct is subject to

effective supervision."

61.　　In a 1996 directive issued by FHA under HUD, the agency reiterated that it:

> requires that FHA Roster appraisers avoid conflicts of interest and the appearance
> of conflicts of interest. In order to help appraisers avoid conflicts or the
> appearance of conflicts, no members of a lender's loan production staff or any
> person (i) who is compensated on a commission basis upon the successful
> completion of a loan or (ii) who reports, ultimately, to any officer of the lender
> not independent of the loan production staff and process, shall have substantive
> communications with an appraiser relating to or having an impact on valuation,
> including ordering or managing an appraisal assignment.

62.　　A second letter in 2010 affirmed these requirements as well as added additional

requirements to DELs with regard to Appraisal Management Companies ("AMCs"):

- FHA Appraisers are not prohibited by the lender, AMC or other third party, from recording the fee the appraiser was paid for the performance of the appraisal in the appraisal report.

- FHA Roster appraisers are compensated at a rate that is customary and reasonable for appraisal services performed in the market area of the property being appraised.

- The fee for the actual completion of an FHA appraisal may not include a fee for management of the appraisal process or any activity other than the performance of the appraisal.

- Any management fees charged by an AMC or other third party must be for actual services related to ordering, processing or reviewing of appraisals performed for FHA financing.

- AMC and other third party fees must not exceed what is customary and reasonable for such services provided in the market area of the property being appraised.

63.     Each of the government mortgage insurance programs also have maximum LTVs, including FHA (95%), Fannie Mae (97%), and Freddie Mac (95%).  The appraisal fraud scheme discussed herein caused mortgages to be issued with true LTV ratios that far exceeded these thresholds.

**D.     The Direct Endorsement Lender Program Provides Vast Authority to Eligible Partipants**

64.     The Government's DEL program provides mortgage originators with a mechanism to obligate the federal government through HUD to streamline the process of obtaining mortgage insurance for loans with minimal HUD review.  The DEL program thus allows DELs to quickly and efficiently close, bundle, and sell loans without the scrutiny of the federal government slowing down the process.

65.     Under the program, DELs originate, underwrite, and fund a proposed loan.  The direct lender collects all supporting documentation from the loan officer or borrower and then obtains an appraisal for the property.  Then, the direct lender underwriter determines whether the

16

loan, under HUD rules, qualifies for FHA insurance through an automated underwriting system, and closes the loan when accepted by the system.[2]

66.     The DEL is also required to order, process, and verify the appraisal from an independent appraiser to ensure that it complies with HUD guidelines.

67.     After the FHA-backed loan is closed by the DEL, the DEL then certifies that the mortgage qualifies for FHA insurance to the federal government, and FHA endorses the loan in reliance on the direct lender's certification, providing the direct lender with a mortgage insurance certificate.

68.     In order to maintain DEL status, banks must meet and certify compliance with several HUD requirements, including: 1) a qualified underwriting staff, meaning full-time employees with authority to bind the company; 2) a fully functioning, independent quality control review plan that ensures compliance with HUD rules, including review of all early payment defaults (defaults within the first six months of payments), and; 3) due diligence on all loans, including the borrower's ability and willingness to make loan payments, and the appropriateness of the loan for that particular borrower.

69.     DELs are fiduciaries of HUD and must conduct the review of the loans and compliance with HUD rules with the utmost good faith and due diligence.

70.     DELs  must certify each year that their operations, and the conduct of their employees, conform to FHA-HUD guidelines.

71.     Further, each loan processed through the direct lender automated underwriting system must be certified by the underwriter processing the loan.  The underwriter certifies compliance with FHA-HUD guidelines, the accuracy of the information provided to the system,

---

[2] Both Fannie Mae and Freddie Mac have similar programs that allow qualified lenders to unilaterally approve loans for sale to the  GSEs through an automated system.

and that, based on the underwriters' review and banking due diligence laws and regulations, the

loan qualifies for FHA insurance.  As discussed above, FHA-HUD relies on this certification to

endorse the loan and issue a mortgage insurance certificate.  This certificate is then used to

demonstrate the quality of the loan once it is bundled into a pool with other loans, giving

investors comfort that the loans are backed by the federal government, and sold as a security on

the secondary market.

**E.**     **Appraisal Independence Laws**

72.     Many state and federal laws require an independent appraisal process for banks

extending loans to borrowers making real property purchases.  For example, the Financial

Institutions Reform, Recovery, and Enforcement Act ("FIRREA") requires all appraisals to be

"independently and impartially prepared by a licensed or certified appraiser."  12 U.S.C. § 3350.

73.     In addition, the Bank Holding Company Act ("BHCA") provides:

(a) Staff appraisers. If an appraisal is prepared by a staff appraiser, that appraiser
must be independent of the lending, investment, and collection functions and not
involved, except as an appraiser, in the Federally related transaction, and have no
direct or indirect interest, financial or otherwise, in the property. If the only
qualified persons available to perform an appraisal are involved in the lending,
investment, or collection functions of the regulated institution, the regulated
institution shall take appropriate steps to ensure that the appraisers exercise
independent judgment and that the appraisal is adequate. Such steps include, but
are not limited to, prohibiting an individual from performing an appraisal in
connection with Federally related transactions in which the appraiser is otherwise
involved and prohibiting directors and officers from participating in any vote or
approval involving assets on which they performed an appraisal.

(b) Fee appraisers.

(1) If an appraisal is prepared by a fee appraiser, the appraiser shall be
engaged directly by the regulated institution or its agent, and have no
direct or indirect interest, financial or otherwise, in the property or the
transaction.

(2) A regulated institution also may accept an appraisal that was prepared by an appraiser engaged directly by another financial services institution, if:

(i) The appraiser has no direct or indirect interest, financial or otherwise, in the property or the transaction; and

(ii) The regulated institution determines that the appraisal conforms to the requirements of this part and is otherwise acceptable.

12 C.F.R. § 225.65.

74.   Further, the Dodd-Frank Act, under 15 §1639e, "Appraisal independence requirements" provides:

(a) In general

It shall be unlawful, in extending credit or in providing any services for a consumer credit transaction secured by the principal dwelling of the consumer, to engage in any act or practice that violates appraisal independence as described in or pursuant to regulations prescribed under this section.

(b) Appraisal independence

For purposes of subsection (a), acts or practices that violate appraisal independence shall include-

(1) any appraisal of a property offered as security for repayment of the consumer credit transaction that is conducted in connection with such transaction in which a person with an interest in the underlying transaction compensates, coerces, extorts, colludes, instructs, induces, bribes, or intimidates a person, appraisal management company, firm, or other entity conducting or involved in an appraisal, or attempts, to compensate, coerce, extort, collude, instruct, induce, bribe, or intimidate such a person, for the purpose of causing the appraised value assigned, under the appraisal, to the property to be based on any factor other than the independent judgment of the appraiser;

(2) mischaracterizing, or suborning any mischaracterization of, the appraised value of the property securing the extension of the credit;

(3) seeking to influence an appraiser or otherwise to encourage a targeted value in order to facilitate the making or pricing of the transaction; and

(4) withholding or threatening to withhold timely payment for an appraisal report or for appraisal services rendered when the appraisal report or

19

services are provided for in accordance with the contract between the parties.

75.     Finally, many states have passed their own appraisal independence laws, including New York, which states that: "No lender or mortgage broker shall improperly influence or attempt to improperly influence the development, reporting, result or review of a real estate appraisal relating to real property securing a home loan." N.Y. BNK. LAW § 590-b.

## V.     SPECIFIC ALLEGATIONS

### A.     Appraisal.com Provides a Vehicle for the Banks to Carry out Appraisal Fraud

76.     Appraisers allow banks to obtain an unbiased, independent valuation of a home to assist in the determination of whether to lend to a particular borrower – an enormously important service in the residential mortgage banking business.  In general, where the home itself, the collateral for a mortgage, is worth less than the buyer is willing or able to pay, then the bank should not issue the loan because it is too risky.  A proper valuation of the home thus protects the lender from a loss in the event of a foreclosure, and the borrower from being over-extended financially.

77.     With advances in technology, and the increased interest of investors in the secondary mortgage market, the overwhelming need to issue and close loans by mortgage originators bred a fraudulent scheme upon the federal and state governments that pervaded the entire residential housing market as banks recognized the ability to obtain mortgage insurance as a means to shift the risk of their own bad loans.

78.     Because banks were able to originate huge volumes of loans, and could then shift the burden of those loans to the Government or secondary buyers, the standards for underwriting the loans unraveled as the need to feed the insatiable secondary mortgage market increased.

20

Many banks, thus, sought to close as many loans as they could, regardless of their own internal underwriting standards, or those of the federal government.

79.     The substantial revenue from the secondary market combined with the commission-based pay structure of most loan officers created an environment charged by two drivers – the size of the loans and the speed of the transaction.

80.     In this case, the Banks and their loan officers similarly sought to close loans on properties as quickly as possible, no matter what those properties were actually worth, using Appraisal.com as a means to accomplish this goal.

81.     Appraisal.com provided the perfect vehicle for the Banks' mortgage and appraisal scheme.  Founded by Mark Yellen in 1997, Appraisal.com, the self-described "leading provider of real estate appraisal software and online transactional tools," provided appraisal consulting services through which it both offered an automated software program for appraisers and banks, as well as, furnished "independent" appraisers for banks issuing a mortgage and in need of an appraisal.

82.     According to Appraisal.com, it enabled "lenders to move the entire appraisal process online by providing them with an end-to-end solution for collateral management and the creation, delivery and use of real estate appraisals over the Internet. This result[ed] in increased efficiency and reduced costs for lenders through the elimination of the paper trail, confusion and shipping costs associated with the traditional appraisal process."

83.     Over the years, Appraisal.com grew to become one of the largest third-party appraisal servicing companies in the country, processing at one time tens of thousands of appraisals per month and earning millions of dollars in revenue each year.

84.     The Appraisal.com software, Day One, required appraisers to load all appraisal documents to an online database to be reviewed and submitted to the issuing bank by Appraisal.com's quality control department.  This allowed appraisers and Appraisal.com to avoid having to deliver, review, and store excessive amounts of paperwork, cutting down on costs and time.  It also gave Appraisal.com and the Banks complete control of the appraisal documents once the appraiser uploaded the file.

85.     Due to the overwhelming temptation to manipulate the mortgage origination process by falsifying appraisals, Appraisal.com and the Banks began using Appraisal.com's software to commit massive appraisal fraud.  To implement the scheme, Appraisal.com and the Banks began colluding to force appraisers to use and become dependent upon Appraisal.com software and services.

**B.     The Banks Force Appraisers to use Appraisal.com's Day One Software**

86.     In the late-1990's and  early-2000's, Appraisal.com began aggressively marketing its software products to banks as a means to cut down on costs, increase speed and efficiency, and to more effectively churn out mortgages to feed the increasing appetite on the secondary investment market for mortgage backed securities.

87.     Around this same time, Appraisal.com's business soared, servicing tens of thousands of appraisals per month.  To increase its reach and the scope of its operations, Appraisal.com began partnering with banks to become their exclusive third-party appraisal consultant and software provider, not only licensing the use of its software but coordinating the appraisals themselves.

88.     In 2002, Appraisal.com partnered with WaMu to offer its A1 (a designation applied by the Appraisal Institute for software forms packages that meet its minimum standards) ready software to appraisers at a discount.  Appraisal.com purportedly designed this software to

22

bring all appraisers up to speed with the new standards, and provide appraisers with a direct link

to the banks to cut down on costs and time. In reality, it gave WaMu more control over the

appraisal process and allowed Appraisal.com to manipulate appraisals in accordance with

WaMu's approval needs.

89.     During this time, M&T also began exclusively using Appraisal.com for all

residential appraisals. Indeed, as discussed in more detail below, M&T completely locked out its

own internal appraisal department from any residential appraisal servicing or review. Thus,

Appraisal.com handled all residential appraisals for M&T, which prohibited its appraisal

department from any compliance or oversight responsibilities with regard to residential loans.

90.     Soon thereafter, Appraisal.com became the exclusive third party appraisal

consultant for NationsPoint and KeyBank, doing hundreds of loans per month for both banks.

Several other regional and national banks joined Appraisal.com's extensive client list around this

time.

91.     Once the Banks and Appraisal.com became partners in utilizing and advancing

the automated software for appraisers, an expectation grew that all appraisers would switch over

to the software, at significant expense to themselves. Appraisal.com made it clear to appraisers

that if the appraisers did not use the software, then they would no longer receive business from

Appraisal.com and its affiliated banks.

92.     By June 2005, Appraisal.com made the entire appraisal process with the Banks

fully automated, including all quality assurance ("Q.A.") review. By removing any checks on

the process, both Appraisal.com and the Banks could manipulate appraisals and defraud

borrowers and the Government at will.

C.    **The Appraisal Scheme**

1.    **Apraisal.com and the Banks Rigged the Appraiser Selection Process**

93.    Appraisal.com's appraisal process began with the submission of an appraisal order from the Bank.  Among her responsibilities as a Customer Care Specialist at Appraisal.com, Relator Myers received and processed these appraisal orders from the Banks.

94.    Upon receiving the order, Customer Care Specialists began the process of selecting an appraiser, a process rigged from the beginning.  Appraisal.com and the Banks required Customer Care Specialists to select appraisers from a pre-approved appraiser list created by the Banks.  Any deviation from the list exposed them to harsh treatment from the Banks, their clients, and put them at risk of reprisal by their supervisors at Appraisal.com.

95.    In general, Relator Myers and the other Customer Care Specialists submitted appraisal offers to three appraisers from the Banks' approved list, and distributed the appraisals on a first-come, first-serve basis.

96.    In approximately 5% of the appraisal orders that came through Appraisal.com, however, the Banks demanded a specific, hand-picked appraiser for the job.  Appraisal.com officers expected Relator Myers and other Customer Care Specialists to make sure these hand-picked appraisers performed the appraisal.

97.    In either case, the process from the beginning compromised independence and ensured that the appraisals themselves would be tainted by bias due to the Banks' direct involvement in appraisal selection.

98.    The appraisers hand-picked by the Banks' loan officers, or listed on the approved appraisers list, were all appraisers that cooperated with the Banks' scheme.  These appraisers met pre-determined appraisal values calculated by the loan officers for closing and approval purposes, used property comparables that would cause the appraisal to arrive at a pre-determined

24

property value, and unilaterally changed bona-fide appraisals at the direction of Appraisal.com and the Banks to ensure continued business with the Banks.  In many ways, the livelihood of the appraisers depended on it.  Appraisers that did not comply with the scheme were immediately removed from the approved list.

99.     Once finished with the appraisal, the appraiser uploaded the appraisal into the Appraisal.com software.  As a member of the Q.A. Team, Relator Marlene Miller reviewed the appraisals prior to submitting them to the bank that ordered them.

## 2.     Appraisal.com Created Sub-Standard Quality Controls to Hide the Fraud

100.     The review process, and quality control measures at Appraisal.com, relied upon by the Banks, were woefully insufficient, and failed entirely to meet the standards required of the Banks by the federal government.

101.     One of only five Q.A. Representatives with Appraisal.com throughout her time there, Relator Miller, along with the other members of the Q.A. Team, reviewed all incoming appraisals before submitting them to the Banks.

102.     Neither Relator Miller nor her co-workers in the department had any prior compliance or quality control experience.  Moreover, Relator Miller was one of the few employees who stayed on in the department for any extended period of time – the Q.A. department had a reputation for being a revolving door of overwhelmed, inexperienced staff members that could not keep up with the demands of the position.

103.     With very little training and no experience, Relator Miller reviewed appraisals right out of the gate, having never before looked at an appraisal in her life.  The Q.A. Team's collective lack of experience was key because its members did not have the requisite training to root out the fraud.

104.    The entire internal review process was limited to a checklist. The team reviewed appraisals for completeness and consistency, not accuracy or compliance. Indeed, the Q.A. Team, including Relator Miller, never reviewed the appraisals for accuracy or for compliance with federal guidelines, nor were they ever trained or instructed on how to do so.

105.    Appraisal.com and the Banks required the Q.A. Team members to move fast, with the sole aim to get the appraisals approved and out the door as quickly as possible in order to move onto the next loan.

106.    Through its hasty review process, Appraisal.com helped feed the mortgage machine as the Banks ramped up the pressure to churn more and more loans.

107.    The huge volumes of business only compounded the deficiencies of an inexperienced staff. At one time, Appraisal.com was servicing tens of thousands of appraisals per month. Miller herself was reviewing approximately 80 appraisals each day as of 2006.

108.    There was simply no way for the Q.A. Team to keep up with that level of volume without neglecting the entire purpose quality controls are meant to fulfill – reviewing the appraisals for accuracy and compliance with federal guidelines. Yet, Q.A. representatives were expected to review and process any appraisal that came into the system within 24 hours. Further, Appraisal.com had a tracking system known as "Calendar Days to Completion" whereby representatives were required to obtain acceptance from the lender within 5 days from submission by the appraiser. Appraisal.com required its Q.A. representatives to churn appraisals at the same rate that the Banks were churning loans, regardless of accuracy or quality.

109.    In addition to speed benchmarks set for the Q.A. review, lender sales representatives were expected to meet monthly quotas for bringing in new lenders to the system, and for the number of appraisals in their respective territories.

110.    Thus, despite the Q.A. Team being overwhelmed and overworked, Appraisal.com management instituted policies that required sales staff to continue to pump in more business. The environment and culture at Appraisal.com, with its limited oversight and boiler room qualities, mimicked that of many mortgage banks at the time and made it tailor-made for a fraudulent scheme.

### 3.    The Banks Ordered Improper Manipulations and Falsifications of Appraisal Documents and Black-Balled Appraisers who Refused to Comply

111.    Upon completion of the review, the Q.A. Team submitted the appraisals to the bank to be included in the loan package for approval by the bank and for FHA and the GSEs.

112.    Both Relator Miller and Relator Myers personally observed that the Banks improperly sent back approximately 50%-75% of the loans processed and reviewed by Appraisal.com to be fraudulently manipulated in order to meet approval standards.   The Banks insisted on these modifications and falsifications without hesitation or consideration of their impropriety under the guidelines.  They were singularly focused on getting the loans processed and approved as quickly as possible.

113.    In most of those cases, Appraisal.com supervisors directed Relator Miller and Relator Myers, as well as other Appraisal.com staff members, to demand that the appraiser improperly and illegally make changes to the previously submitted bona fide appraisal, in direct violation of federal and state law.

114.    For example, on numerous occasions, the Banks directed Appraisal.com to order the appraiser to make adjustments to the comparables to skew the true value of the subject property.  In many other cases, the Banks directed Appraisal.com to order the appraiser to actually unilaterally adjust the value of the appraisal.  In all of these cases, the fraudulent directives by the Banks were aimed at inflating the appraisal value so that the LTV decreased to

27

an approvable percentage for the Banks and for the federal agencies supplying insurance on the loan. The practice resulted in the issuance of thousands of loans with government mortgage insurance to ineligible borrowers. Default on these fraudulent loans, therefore, was almost inevitable and resulted in the submission of claims for insurance from the federal government by the subsequent holder of the loan.

115.    In some cases, appraisers declined to fraudulently modify bona-fide appraisals, refusing to be bullied by the Banks and the appraisal company that controlled the market. Appraisal.com and the Banks black-balled these appraisers and immediately removed them from approved appraiser list of the Banks.

116.    Appraisal.com supervisor AnneMarie Furhman generally managed the day-to-day operations at Appraisal.com. She also fielded calls from the Banks requesting that Appraisal.com falsify appraisal documents and frequently directed her staff to order appraisers to fraudulently change appraisals. In those cases where the appraiser refused, she directed staff to unilaterally make the changes for the Banks in the software themselves, manipulating secure pdfs to reflect accurate appraisal documents for the Banks.

117.    On more than one occasion, Furhman ordered Relator Miller and Relator Myers to fraudulently alter secure pdf documents because the appraiser refused to illegally manipulate the data when prompted.

118.    In one instance, in November 2006, Furhman called Relator Myers, working the night shift, and explained that a NationsPoint appraisal needed to be completed for the next day. Furhman ordered Relator Myers to manually increase the value on the appraisal in the system as requested by a loan officer from NationsPoint. Worried that if she did not make the change that she would be fired, Relator Myers manually adjusted the value on the appraisal form and

28

resubmitted the appraisal to the Bank.  Relator Myers made similar manual adjustments on

appraisal forms throughout her employment at Appraisal.com, which rewarded her efforts with

Employee of the Year in 2006.

119.    Relator Myers also has direct and personal knowledge of appraisers making such

changes themselves when asked by her or other Customer Care Representatives at

Appraisal.com.  She specifically recalls that M&T, KeyBank, WaMu, and NationsPoint, as well

as other banks, requested that material changes be made to the appraisal documents and

appraisers acquiesced for fear of being black listed.  Orders to make these changes came directly

from either CEO Mark Yellen, or Vice President Mike Gilbert, as communicated through

Furhman.

120.    In another case, Furhman directed Relator Miller to ask an appraiser, Douglas

Honeycutt of Yorktown, VA, with whom she had a good relationship, to make changes to an

M&T appraisal, believed to be a value change on the property.

121.    Relator Miller contacted Honeycutt and explained to him that she had been asked

to request that he make the change to the appraisal.  Honeycutt refused to make the change,

stating that it would be illegal to do so.  As a result, Appraisal.com removed Honeycutt from the

approved appraiser list immediately.  Honeycutt later refused to work with Appraisal.com on any

future appraisals and declined to renew his Appraisal.com membership the following year due to

its continued illegal practices.

D.      **The Impact of the Banks' and Appraisal.com's Scheme on Loan-to-Value Ratios**

122.    The LTV ratio  is one of the principal factors that banks, investors, and

governmental loan insurance providers use to determine the riskiness of the loan.

123.     Calculated by dividing the total loan amount by the actual value of the property based on the appraisal, the LTV provides the best indicator as to whether the borrower will be able to pay back the loan.

124.     Generally, FHA and the GSEs did not allow LTV ratios above 90%, but had an absolute maximum LTV of 96.5%.  In cases where a LTV was high, Banks would generally require borrowers to show stronger credit history or income levels to compensate, and the higher LTV would always result in a higher interest rate for the borrower.

125.     There is, however, a ceiling to the amount of risk a bank and the Government will absorb in issuing and insuring a loan.  Accordingly, both impose a cap on how high an LTV the banks, FHA, and the GSEs would allow.

126.     Without question, neither the Banks nor the Government should or would want borrowers taking on loans for properties that were greater than the property was actually worth. Due to the practices of Appraisal.com and the Banks, this is, however, assuredly what occurred as a result of the appraisal scheme.

127.     To illustrate, if a borrower took out a loan for $500,000, and the appraised value of the house was inflated by Appraisal.com and the issuing bank to $535,000, the LTV ratio would be approximately 93.5%. But, where that property was actually worth $495,000, the actual LTV would be 101%.  A loan with a mortgage amount that is greater than the value of the property itself is "underwater." No bank, nor government insurance provider, would approve a mortgage that was underwater from the beginning – it would not make business sense.

128.     By disguising the true value of the homes for which loans were issued, the Banks indeed caused the federal government to insure numerous enormously risky, unqualified loans.

E.     **The Culture of Fraud at M&T Bank Provided the Perfect Symmetry with Appraisal.com's Business Model**

129.    M&T is one of the 20 largest commercial bank holding companies in the United States with operations throughout New York, Maryland, North Carolina, Ohio, Oregon, Pennsylvania, Washington, Virginia, West Virginia, New Jersey, Delaware, and the District of Columbia, among others.  M&T is (and was through M&T Mortgage Corporation) a DEL and has approximately $68 billion in total, consolidated assets.

130.    An undeniably close, and in many ways improper, relationship existed between Appraisal.com and M&T, perhaps more so than any other of the Banks.  For years the two worked closely together, with Appraisal.com exclusively coordinating, processing, reviewing, and finalizing all outside appraisals for M&T.

131.    Appraisal.com's and M&T's offices were directly across the street from one another, and Appraisal.com had M&T Bank signs displayed across its own storefront windows.  Internally, M&T employees often joked that Appraisal.com was just another local branch of the bank.  At its height, Appraisal.com was servicing over a hundred M&T appraisals per day.

132.    Relator Lester was the Chief Appraiser at M&T and worked for the bank in various capacities for over 25 years.  In May 2005, M&T instituted an internal appraisal policy requiring that all appraisals for commercial and residential loans be ordered and processed through the M&T's independent appraisal department.  Such a policy was consistent with the independence requirements of the various appraisal laws.

133.    In practice, however, M&T not only failed to follow the internal policy in the commercial department, which was well known, but Relator Lester and his entire department were completely walled off from the operations of the residential loan department.

31

134.     Around the same time, M&T switched over to a completely automated system on the Appraisal.com software for its residential appraisals allowing it unfettered access to the appraisals as they were submitted by appraisers, avoiding even the Appraisal.com Q.A. review.

135.     Indeed, a culture of fraud permeated the entirety of M&T's mortgage operations, as volume and speed became paramount. The motto at M&T was, "There's never a deal that we don't like."

136.     Because of the firewall between M&T's Appraisal Department and the residential mortgage division, Relator Lester's primary responsibilities were to oversee the appraisals for M&T's commercial mortgage division, including residential commercial subdivision loans.

137.     On these residential subdivision loans, Relator Lester observed countless examples of blatant, widespread appraisal fraud from loan officers. Among the practices of these loan officers, he personally observed the regular intimidation of M&T Appraisal Department personnel by M&T loan officers to select their own hand-picked appraisers who would play ball with their schemes, successfully pressuring appraisers into meeting predetermined appraisal amounts or increasing values on already completed appraisals, precluding or black-listing appraisers who were not complicit, and rewarding appraisers who played along.

138.     Two particularly egregious loan officers during Relator Lester's tenure as Chief Appraiser, Gary Martin and Devon Finan, were routinely abusive to appraisers who did not cooperate with their improper instructions to manipulate the appraisal process. Both M&T loan officers not only secured loans for residential subdivision properties, but also the loans on the underlying homes within those subdivisions. Relator has personal knowledge that both Martin and Finan fraudulently caused appraisers to change values, and hand-picked appraisers that would cooperate with their scheme. Relator Lester first learned of this practice of these loan

32

officers, as well as others, around 2004, which continued through Relator Lester's employment with the bank, even after he explicitly reported their improper behavior, including some of the allegations that form the basis of this Complaint, in 2010 to M&T Chief Auditor John D'Angelo.

139.     The lack of appraisal independence effected M&T's entire mortgage origination business, a huge revenue driver for the bank.  Indeed,  Relator Lester routinely fielded complaints about loan officer misconduct by appraisers and members of the appraisal department.  In a 2008 year-end compliance review, Vice President and Appraisal Manager Paul Niedzieleski wrote, "Since my effective June 2007 employment date, I have experienced a number of M&T Bank Management and non-management level employees brazenly demonstrate a disregard towards appraiser independence."

140.     Relator Miller and Relator Myers also have personal knowledge that M&T loan officers routinely required hand-picked appraisers for their appraisals, required appraisers to come only from an approved list, pressured Appraisal.com staff to rig the appraisal approval process by falsifying appraisal documents, and directed Appraisal.com staff to require appraisers to meet pre-determined appraisal values.  In the case highlighted above, Appraisal.com supervisor Anne Marie Furhman ordered Relator Miller to pressure an appraiser to manipulate an appraisal at the direction of an M&T loan officer.  When that appraiser refused, Furhman ordered Relator Miller to do it herself, who also refused.  Both Relator Miller and Relator Myers recall regular improper requests from M&T loan officers to manipulate appraisals on the enormous volumes of appraisals being performed for the bank through Appraisal.com.

141.     Upon discovering the fraud internally, Relator Lester began reporting it to his supervisors.  His complaints were heard, summarily dismissed, and he became a target of hostility and retaliation.  He first reported the misconduct and fraud to Appraisal Manager Pete

Mathews who did not report to violations to M&T or reprimand the primary offenders. Relator Lester also reported the fraudulent conduct to Senior Vice President Robert Graber who not only failed to properly investigate Relator Lester's allegations, but began outwardly treating Relator Lester with hostility, publicly belittling him over the course of seven months culminating in Graber's announcement of Relator Lester's retirement at a department wide meeting when Relator Lester never expressed a desire to retire.

142.    After his complaints were discarded by M&T senior management, Relator Lester called the bank's internal hotline. On that call, in addition to outlining the general issues related to a complete lack of appraisal independence within M&T, he highlighted issues with Appraisal.com: "I also would like to report some improprieties that have to do with Appraisal.com. Appraisal.com ordered the reviewers, ordered the appraisals, I should say, and then reviewed them, for M&T Bank residentials. There were serious improprieties with Appraisal.com..." To Relator Lester's knowledge, no investigation was ever conducted nor any action taken with regard to the rampant improper appraisal process in which M&T and Appraisal.com colluded to gain approval for and issue thousands of fraudulent loans to borrowers.

### F.    Washington Mutual Committed Extensive Appraisal Fraud Through Appraisal.com

143.    WaMu was a savings bank holding company with a substantial residential and commercial mortgage business that, as of 2005, was the third largest lender in the United States. In 2007, WaMu held approximately $327.9 billion in assets.

144.    In 2008, in the biggest bank failure in U.S. History, federal regulators seized all of WaMu's assets and sold off its entire loan portfolio, approximately $307 billion, to JP. Morgan. WaMu's failure has been attributed in large part to its high-risk home-lending program.

34

145.    As discussed above, WaMu, formerly a DEL, began to use Appraisal.com software in 2002 for its residential loans, several years prior to the mortgage crisis suffered in 2008 as a result of the unprecedented wave of defaulting borrowers who should have never been issued a mortgage in the first place.

146.    Over the course of the next few years, WaMu became one of Appraisal.com's biggest clients, using the third-party appraisal company to order and review most of its residential appraisals nationwide.

147.    Relator Myers and Relator Miller both handled dozens of appraisals for WaMu including processing the orders, coordinating with appraisers, and reviewing the appraisals for completeness and consistency.

148.    Both Relator Myers and Relator Miller have personal knowledge that WaMu loan officers demanded hand-picked appraisers for appraisals, required Appraisal.com to use only appraisers from WaMu's approved appraiser list, black balled appraisers that did not cooperate with their improper attempts to manipulate the appraisal process, and required Appraisal.com staff to order appraisers to falsify appraisal documents in order to meet pre-determined appraisal values in violation of federal and state law.

149.    WaMu's improper conduct resulted in the issuance of loans to borrowers who otherwise did not qualify, and, in the procurement of government insurance on those loans. When the unfit borrowers eventually defaulted, WaMu's conduct caused the submission of false insurance claims in violation of the false claims act.

150.    Accordingly, WaMu is liable to the federal government for each defaulted loan upon which the government paid a false insurance claim.

151.     WaMu also violated the FCA by falsely certifying compliance with federal guidelines in the procurement of government mortgage insurance. WaMu, therefore, is liable to the federal government for each false certification it made on the basis of its compliance with federal underwriting and appraisal guidelines.

152.     Additionally, many States and state pension funds suffered losses as a result of purchasing securities containing WaMu loans following false claims regarding the soundness of the investments made directly to the States and caused to be made by the Banks and Appraisal.com.

### G.     NationsPoint Caused False Claims to be Submitted through its Appraisal Scheme with Appraisal.com

153.     NationsPoint, also a DEL, was an online direct-to-consumer mortgage lender based in Lake Forest, CA, that by the late-1990's grew to become one of the largest lenders of its kind, issuing tens of thousands of mortgages in 48 states across the country. In 2005 alone, NationsPoint, along with its affiliated mortgage origination business, First Franklin Financial, originated $29 billion in loans.

154.     In late-2006, NationsPoint was acquired by Merrill Lynch, a subsidiary of Bank of America, through a deal by which it purchased all of the assets of its Cleveland-based parent, National City for $1.3 billion.

155.     In its marketing materials, NationsPoint proclaimed that it "leverages technology and the internet to provide consumers with a fast, easy and transparent mortgage process." NationsPoint certainly leveraged technology to provide a fast and easy mortgage process, but that process was anything but transparent and it was not provided to consumers.

156.    NationsPoint was one of Appraisal.com's biggest customers, utilizing Appraisal.com's software exclusively by the early-2000's and procuring its appraisal consulting services for all of its residential loans.

157.    Like WaMu and M&T, NationsPoint loan officers routinely required hand-picked appraisers for the loans, mandated that only appraisers from their approved list be used for their appraisals, black-balled appraisers who refused to comply, and demanded that pre-determined property values be met regardless of the bona-fide appraisal results.

158.    As discussed above, in November 2006, Appraisal.com supervisor Anne Marie Furhman demanded that Relator Myers manually falsify an appraisal value at the direction of a NationsPoint loan officer.  Both Relator Myers and Relator Miller recall that similar requests were common of NationsPoint loan officers and that Appraisal.com processed, coordinated, and serviced substantial volumes of fraudulent NationsPoint loans.

159.    As a result of this unlawful conduct, NationsPoint issued thousands of loans to unqualified borrowers, and procured federal mortgage insurance on many of these loans.  In addition, thousands of NationsPoint loans were sold into the secondary mortgage market and ended up in the portfolios of state pension funds through their investment in mortgage backed securities.

160.    The defaulting of borrowers on NationsPoint loans, therefore, caused substantial damages to the federal government and the States in violation of the FCA and the false claims acts of the States.

**H.    KeyBank Directly Participated in the Appraisal Scheme Through Appraisal.com**

161.    DEL KeyBank is one of the largest regional banks in the United States with $91 billion in total assets and operations in at least thirteen different states.

162.    By the early- to mid-2000's, KeyBank also used Appraisal.com software and Appraisal.com's appraisal consulting services, including appraisal selection, appraisal processing, and appraisal quality control review.

163.    Both Relator Myers and Relator Miller have personal knowledge that KeyBank loan officers committed appraisal fraud by hand-picking appraisers for their appraisals, requiring appraisers be selected from a pre-approved list, directing Appraisal.com to manipulate appraisals in order to conform with federal mortgage insurance and banking approval standards, and pressuring appraisers to falsify appraisal documents.

164.    KeyBank's and Appraisal.com's appraisal fraud resulted in the issuance of loans to unfit borrowers and federal mortgage insurance on unqualified loans in violation of the false claims act. Moreover, KeyBanks' fraudulent loans entered the secondary mortgage market and caused false claims to be submitted to the States through their pension funds.

165.    KeyBank and Appraisal.com, therefore, are liable for all losses suffered by the Government and the States as a result of the false claims violations described herein.

**I.**     **The Appraisal Fraud Caused False Claims to be Submitted to the Government**

166.    As with many lenders during the mortgage crisis, the Banks working with Appraisal.com issued enormous amounts of loans well beyond their own risk tolerance. But, more importantly, they certified enormous amounts of fraudulent loans to pass on to FHA for insurance and sold the loans to the GSEs upon certification under their guidelines. These fraudulent loans fell well beyond the risk tolerance of the federal government. By obtaining insurance on the loans, and selling them off to the GSEs or other banks, the Banks completely insulated themselves from any risk associated with the toxic loans they originated and passed that risk off to the Government.

38

167.     As cited above, FHA and the GSEs had maximum LTV ratios of between 90 –

95%.  Furthermore, most internal lender guidelines capped LTV ratios at as low as 80%.  It is

likely, however, that the Banks were issuing loans at LTV ratios of well above 100%, while

knowingly misrepresenting that the LTV ratios were within their guidelines.  This itself was a

false claim.

168.     But, even more damaging, this misrepresentation to either FHA or the GSEs

caused false claims to be submitted when these risky borrowers defaulted.  With FHA, the owner

of the loan submitted a claim for insurance from the federal government for payment of the loan

principal upon default by the borrower.

169.     In order to submit a claim for insurance on the defaulted loan, the owner of the

loan must make some of the following representations: (i) the appraisal amount was true and

accurate assessment of market value; (ii) that the appraiser fully inspected the property; (iii) that

the comparables used to asses the property were appropriate; (iv) that the appraiser followed

USPAP guidelines; (v) that the particular appraiser had the requisite knowledge and experience

to accurately appraise or value the subject property; (vi) that certain critical information was not

withheld during the appraisal process; (vii) that the appraisal report was the product of the

appraisers own unbiased analysis, findings, and opinion; (viii) that the hiring of the appraiser was

not based upon any agreement of a predetermined value for the property; (ix) that due diligence

was used in underwriting the mortgage; (x) and, that the mortgage is eligible for mortgage

insurance under the Government mortgage insurance programs.

170.     These representations were false for each and every loan issued by the Banks that

contained Appraisal.com serviced appraisals because of the fraudulent appraisal scheme of

Appraisal.com and the Banks.  Thus, because every single loan issued by the Banks with an

Appraisal.com appraisal violated at least some element of the appraisal guidelines, every claim

for insurance made on these loans amounted to a false claim.

171.    In addition to the false claims submitted for the recovery of insurance on FHA

loans, false claims were submitted by investors in securities created and sold by the GSEs with

loans issued by the Banks that contained fraudulent appraisals serviced by Appraisal.com.

J.    **The Banks and Appraisal.com Violated State False Claims Acts by Causing Misrepresentations to be Made in the Sale of Mortgage-Backed Securities**

172.    As set forth in the preceding paragraphs, the Banks and Appraisal.com engaged in

widespread mortgage and appraisal fraud that not only damaged the federal government, but,

also, overly committed mortgage related securities investors, the States and state pension funds.

173.    The Banks sold pools of their fraudulent loans to investment banks and the GSEs

on the secondary market to be securitized and peddled to institutional investors like state pension

funds.

174.    In order to do so, the investment banks and GSEs issued prospectuses that

described the underlying loans in the security.  The prospectuses made several representations

about the underlying collateral, including the quality of the loans, the accuracy of the borrower

information that made up the loans, that fraud was not committed in the origination of the loans,

among other things.  Many of these prospectuses also contained direct statements about the

accuracy of appraisals and the conformity to appraisal guidelines, including USPAP.

175.    For example, in a security issued by Goldman Sachs in 2007 which contained

over 6,000 M&T mortgages, a Free Writing Prospectus issued on February 22, 2007, stated the

following:

> The appraisal must be conducted in accordance with established appraisal
> procedure guidelines acceptable to the originator in order to determine the
> adequacy of the mortgaged property as security for repayment of the related
> mortgage loan. All appraisals must be on forms acceptable to Fannie Mae and/or

40

Freddie Mac and conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. Appraisers may be staff licensed appraisers employed by the originator or independent licensed appraisers selected in accordance with established appraisal procedure guidelines acceptable to the originator. Generally, the appraisal procedure guidelines require the appraiser or an agent on its behalf to inspect the property personally and verify whether the property is in good condition and that, if new, construction has been substantially completed. The appraisal generally will be based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

176.    Relators have personal knowledge that these statements, as well as similar statements issued by the Banks, the investment banks, and the GSEs that purchased mortgages from the Banks, were false at the time they were made due to their reliance on misrepresentations made by the Banks and by Appraisal.com.

177.    The Banks and Appraisal.com, therefore, caused false claims to be submitted by the secondary sellers of the loans through the false offering and sale of these mortgage-backed securities to these state and municipal pension funds.

178.    The false claims acts of the States each contain provisions that make it unlawful to cause the making of a false claim for payment to the government.

179.    Accordingly, misrepresentations and certifications of the Banks and Appraisal.com during the sale of fraudulent loans to commercial and investment banks caused the secondary sellers themselves to make false certifications and misrepresentations to state pension and other related credit funds in connection with the purchase of an interest in mortgage related securities. The misrepresentations and certifications made to the state and municipal pension funds concerning the quality, nature, performance and/or stability of the mortgage-backed securities contained false claims for payment under the relevant false claims acts of the States involved.

41

180.    The Banks and Appraisal.com knew or should have known that its loans would be sold to various types of investors, including state and municipal pension funds, whose purchasing agents for these funds would have never bought an interest in any low value, high-risk mortgage related securities if they knew that the loans contained in the pool offered or sold to them had been falsely and fraudulently created and/or certified as safe and performing. Thus, Banks and Appraisal.com knowingly caused the secondary sellers, including the Banks, to make false statements in connection with the sale of the mortgage related securities to these public investors.

181.    The Banks' and Appraisal.com's fraudulent appraisal scheme also caused the States to invest more in securities then they were actually worth because the inflated appraisal values inflated the value of the security. Had the States known that the securities they invested in were worth less than they paid due to the inflated property values, they would have paid less. As a result, the Banks' and Appraisal.com are not only liable for the losses suffered from the investment in these collapsing securities, but for the overpayment of the true value of the securities.

182.    The Banks' and Appraisal.com's fraudulent conduct violated the false claims acts of those States invested in mortgage related securities with the Banks' loans and resulted in millions of dollars in losses to their public investment funds.

I.   **The Banks Violated the FCA by Making Misrepresentation to the Government in Order to Obtain TARP Bailout Money**

183.    As a result of the financial crisis, many banks, including the Banks that committed the appraisal fraud alleged herein, obtained bailout money from the government through the Troubled Asset Relief Program ("TARP").

184.    Under the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Congress made clear that the FCA reaches TARP, and any misrepresentations made to the Government with regard to eligibility for TARP funds, as well as any failure to act as a condition of payment where a certification has been made that the act has been performed.

185.    The Banks made certain representations regarding its mortgage and appraisal practices which they knew to be materially false, including representations that they followed federal guidelines in the mortgage origination and closing process, and that the Banks had not committed mortgage fraud.

186.    These false certifications, made as a condition of payment under TARP, violate the false claims act. As a result, to the extent that the Banks have repaid the TARP bailout money in full, each is liable for penalties for each violation of the FCA.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### (False Claims Act: Presentation of False Claim – 31 U.S.C. § 3729(a)(1)(A))
### (HUD/FHA)

187.    All of the preceding allegations are incorporated herein.

188.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented false or fraudulent claims for payment or approval in connection with its endorsement of FHA insured mortgages in violation of 31 U.S.C. § 3729(a)(1)(A).

189.    As a result, the Government made substantial payments on insurance claims and incurred substantial losses related to the FHA insured mortgages wrongfully endorsed by Defendants because of its wrongful conduct.

43

190.    Accordingly, the Government has suffered damages in the amount of hundreds of millions of dollars improperly paid FHA insurance claims and is entitled to a civil penalty for each and every violation of the FCA as required by law.

## COUNT II
**(False Claims Act: Making or Using a False Record of Statement
to Cause a Claim to be Paid – 31 U.S.C. § 3729(a)(1)(B))
(HUD/FHA/VA)**

191.    All of the preceding allegations are incorporated herein.

192.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants knowingly, or acting with disregard for the truth, made, used, or caused to be made or used, false record or statements in connection with its endorsement of FHA insured mortgages in violation of 31 U.S.C. § 3729(a)(1)(B).

193.    As a result, the Government made substantial payments on insurance claims and incurred substantial losses related to the FHA insured mortgages wrongfully endorsed by Defendants because of their wrongful conduct.

194.    Accordingly, the Government has suffered damages in the amount of hundreds of millions of dollars improperly paid FHA insurance claims and is entitled to a civil penalty for each and every violation of the FCA as required by law.

## COUNT III
**(False Claims Act: Presentation of False Claim – 31 U.S.C. § 3729(a)(1)(A))
(Fannie Mae/Freddie Mac)**

195.    All of the preceding allegations are incorporated herein.

196.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants knowingly, or acting with reckless disregard for the truth, made false representations about the quality of its loans at the time of the sale of the loans to Fannie Mae

and Freddie Mac, including that the loans were of investment quality and complied with the GSE selling guides and purchase contracts.

197.    Defendants' misrepresentations about loan quality were material to the purchase of the loans by Fannie Mae and Freddie Mac.

198.    Fannie Mae and Freddie Mac suffered substantial losses as a result of Defendants' misrepresentations in the form direct losses from the defaulting of loans in their investment portfolios, and in the form of paying guarantees to third parties after the guaranteed loans defaulted.

199.    Treasury funds have been used to purchase Defendants' appraised loans and to reimburse Fannie Mae and Freddie Mac from losses suffered due to Defendants' misrepresentations.

200.    As a result, the Government has suffered damages in the amount of hundreds of millions of dollars due to the investment in or guarantees made on loans sold to Fannie Mae and Freddie Mac and is entitled to a civil penalty for each and every violation of the FCA as required by law.

## COUNT IV
### (False Claims Act: Presentation of False Claim – 31 U.S.C. § 3729(a)(1)(B))
### (Fannie Mae/Freddie Mac))

201.    All of the preceding allegations are incorporated herein.

202.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, made false representations about the quality of its loans at the time of the sale of the loans to Fannie Mae and Freddie Mac, including that the loans were of investment quality and complied with the GSE selling guides and purchase contracts.

203.   Defendants' misrepresentations about loan quality and appraisals were material to the purchase of the loans by Fannie Mae and Freddie Mac.

204.   Fannie Mae and Freddie Mac suffered substantial losses as a result of the Defendants' misrepresentations in the form direct losses from the defaulting of Defendants' appraised loans in their investment portfolios, and in the form of paying guarantees to third parties after the guaranteed loans purchased from Defendant Banks defaulted.

205.   Treasury funds have been used to purchase Defendant Banks' loans and to reimburse Fannie Mae and Freddie Mac from losses suffered due to Defendants misrepresentations.

206.   As a result, the Government has suffered damages in the amount of hundreds of millions of dollars due to the investment in or guarantees made on loans sold to Fannie Mae and Freddie Mac.

### COUNT V
### (False Claims Act: Conspiracy – 31 U.S.C. § 3729(a)(1)(C))

207.   All of the preceding allegations are incorporated herein.

208.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have conspired to make or present false or fraudulent claims and performed one or more acts to effect payment of false or fraudulent claims.

209.   As a result, the Government has suffered damages in the form of hundreds of millions of dollars in improper payments for insurance claims caused to be made by and through Defendants' misrepresentations.

### COUNT VI
### (California False Claims and Reporting Act)
### (Cal. Gov't Code §12650, et seq.)

210.   All of the preceding allegations are incorporated herein.

46

211.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the pension funds of the California State Government for payment or approval.

212.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

213.     The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

214.     By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

215.     Pursuant to Cal. Gov't Code §12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT VII
### (Delaware False Claims and Reporting Act)
### (Del Code Ann. tit. 6, §§ 1201, et seq.)

216.     All of the preceding allegations are incorporated herein.

217.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the pension funds of the Delaware State Government for payment or approval.

218.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

219.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

220.    By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

221.    Pursuant to Del Code Ann. tit. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT VIII**
**(Florida False Claims Act)**
**(Fla. Stat. Ann. §§ 68.081, et seq.)**

222.    All of the preceding allegations are incorporated herein.

223.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

224.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

225.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

226.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

227.    Pursuant to Fla. Stat. Ann. § 68.082(2), the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT IX**
**(Georgia Taxpayer Protection Act)**
**(Ga. Code. Ann. §§ § 23-3-120, et seq.)**

228.    All of the preceding allegations are incorporated herein.

229.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

230.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

231.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

232.     By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

233.     Pursuant to Ga. Code. Ann. § 23-3-121, the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT X
### (Hawaii False Claims Act)
### (Haw. Rev. Stat. §661-21, et seq.)

234.     All of the preceding allegations are incorporated herein.

235.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

236.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

237.     The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

238.     By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

239.     Pursuant to Haw. Rev. Stat. § 661-21(a), the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every

false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XI
### (Illinois Whistleblower Reward and Protection Act)
### (740 Ill. Comp. Stat. §§ 175/1, et seq.)

240.    All of the preceding allegations are incorporated herein.

241.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

242.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

243.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

244.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

245.    Pursuant to 740 Ill. Comp. Stat. § 175/3(a), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XII
### (Indiana False Claims Act)
### (Indiana Code 5-11-5.5, et seq.)

246.    All of the preceding allegations are incorporated herein.

247.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

248.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

249.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

250.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

251.    Pursuant to Ind. Code § 5-11-5.5-2(b), the State of Indiana is entitled to three times the amount of actual damages plus at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIII
### (Iowa False Claims Act)
### (Iowa Code Ann. §§ 685.1, et seq.)

252.    All of the preceding allegations are incorporated herein.

253.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

254.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

255.     The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

256.     By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

257.     Pursuant to Iowa Code Ann. § 685.2, the State of Iowa is entitled to three times the amount of actual damages plus at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XIV**
**(Massachusetts False Claims Law)**
**(Mass. Gen. Laws ch. 12, §§ 5A, et seq.)**

258.     All of the preceding allegations are incorporated herein.

259.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts Commonwealth Government for payment or approval.

260.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material

facts, to induce the Massachusetts Commonwealth Government to approve and pay such false and fraudulent claims.

261. The Massachusetts Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

262. By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

263. Pursuant to Mass. Gen. Laws ch. 12, § 5B, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XV**
**(Minnesota False Claims Act)**
**(Minn. Stat. § 15C.01, et seq.)**

264. All of the preceding allegations are incorporated herein.

265. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

266. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

267. The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

54

Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

268.     By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

269.     Pursuant to Minn. Stat. § 15C.02, the State of Minnesota is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XVI
### (Montana False Claims Act)
### (Mont. Code Ann. § 17-8-402, et seq.)

270.     All of the preceding allegations are incorporated herein.

271.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

272.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

273.     The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

274.     By reason of the Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

275.    Pursuant to Mont. Code Ann. § 17-8-403(2), the State of Minnesota is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XVII
### (Nevada False Claims Act)
### (Nev. Rev. Stat. §§ 357.010, et seq.)

276.    All of the preceding allegations are incorporated herein.

277.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

278.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

279.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

280.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

281.    Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XVIII
### (New Jersey False Claims Act)
### (N.J. Stat. Ann. §§ 2A:32C-1, et seq.)

282.    All of the preceding allegations are incorporated herein.

283.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

284.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

285.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

286.    By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

287.    Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty allowed under the federal False Claims Act, 31 U.S.C. § 3729, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIX
### (New Mexico Fraud Against Tax Payers Act)
### (N.M. Stat. Ann. §§ §§ 44-9-1, et seq.)

288.    All of the preceding allegations are incorporated herein.

289.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

290.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

291.     The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

292.     By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

293.     Pursuant to N.M. Stat. Ann. § 27-14-4 and § 44-9-3, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XX
### (New York False Claims Act)
### (N.Y. State Fin. Law §§ 187, et seq.)

294.     All of the preceding allegations are incorporated herein.

295.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

296.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

297.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

298.    By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

299.    Pursuant to N.Y. State Fin. Law § 189.1(g), the State of New York is entitled to three times the amount of actual damages plus the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XXI
**(North Carolina False Claims Act)**
**(N.C. Gen. Stat. Ann. 52 §1-605, et seq.)**

300.    All of the preceding allegations are incorporated herein.

301.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

302.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

303.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

304.    By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

305.    Pursuant to N.C. Gen. Stat. Ann. 52 § 1-607, the State of North Carolina is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XXII
### (Rhode Island False Claims Act)
### (R.I. Gen. Laws §§ 9-1.1-1, et seq.)

306.    All of the preceding allegations are incorporated herein.

307.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

308.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

309.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

60

310.     By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

311.     Pursuant to R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXIII**
**(Tennessee False Claims Act)**
**(Tenn. Code Ann. §§ 4-18-101, et seq.)**

312.     All of the preceding allegations are incorporated herein.

313.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

314.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

315.     The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

316.     By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

317.     Pursuant to Tenn. Code Ann. § 4-18-103, the State of Tennessee is entitled to three times the amount of actual damages plus at least $10,000 for each and every false or

fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXIV
### (Virginia Fraud Against Taxpayers Act)
### (Va. Code Ann. §§ 8.01-216.1, et seq.)

318.   All of the preceding allegations are incorporated herein.

319.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia Commonwealth Government for payment or approval.

320.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Virginia Commonwealth Government to approve and pay such false and fraudulent claims.

321.   The Virginia Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

322.   By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

323.   Pursuant to Va. Code § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXV
### (District of Columbia False Claims Act)
### (D.C. Code Ann. §§ 2-308.03, et seq.)

324.    All of the preceding allegations are incorporated herein.

325.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

326.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

327.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

328.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

329.    Pursuant to D.C. Code Ann. § 2-308.14, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXVI
### (New York City False Claims Act)
### (Administrative Code §§ 7-801, et seq.)

330.    All of the preceding allegations are incorporated herein.

331.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York City Government for payment or approval.

332.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New York City Government to approve and pay such false and fraudulent claims.

333.    The New York City Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

334.    By reason of the Defendants' acts, New York City has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

335.    Pursuant to Administrative Code §7-803, New York City is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented by Defendants.

## VII.    DEMANDS FOR RELIEF

**WHEREFORE,** Relators, on behalf of the United States Government \demands judgment against Defendants ordering that:

A.    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government sustained because of Defendants' actions which Relators currently estimate to be tens of millions of dollars, plus civil penalty of not less than $6,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq.*;

B.      Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §
3730(d) of the False Claims Act and/or any other applicable provision of law;

C.      Relators be awarded all costs and expenses of this action, including attorneys fees
as provided by 31 U.S.C. § 3730(d) and any other applicable provision of law; and,

D.      Relators be awarded such other and further relief as the Court may deem to be just
and proper.

**WHEREFORE**, for each of these claims, the Qui Tam Plaintiffs requests the following
relief from each of the Defendants, jointly and severally, as to the State claims:

A.      Relators and each named State Plaintiff be awarded statutory damages in an
amount equal to three times the amount of actual damages sustained by each State as a result of
Defendants' actions, as well as the maximum statutory civil penalty for each violation by
Defendants within each State, all as provided by:

>            Cal. Govt. Code § 12651;
>
>            6 Del. C. § 1201;
>
>            Fla. Stat. Ann. § 68.082;
>
>            Ga. Code. Ann. §§ § 23-3-121
>
>            Haw. Rev. Stat. § 661-21;
>
>            740 Ill. Comp. Stat. § 175/3;
>
>            Ind. Code § 5-11-5.5-2 ;
>
>            Iowa Code Ann. § 685.2;
>
>            Mass. Gen. Laws Ch. 12 § 5B;
>
>            Minn. Stat. § 15C.02;
>
>            Mont. Code Ann. § 17-8-403(2);
>
>            Nev. Rev. Stat. Ann. § 357.040;

N.J. Stat. Ann. § 2A:32C-3;

N.M. Stat. Ann. § 27-14-4 and § 44-9-3;

N.Y. Fin. Law § 189.1(g);

N.C. Gen. Stat. Ann. 52 § 1-607;

R.I. Gen. Laws § 9-1.1-3;

Tenn. Code Ann. § 4-18-103

Va. Code Ann. § 8.01-216.3;

D.C. Code Ann. § 2-308.14;

Administrative Code §7-803.

B.     Relators be awarded their relators' share of any judgment to the maximum

amount provided pursuant to:

Cal. Govt. Code § 12652(g)(2);

6 Del. C. § 1205;

Fla. Stat. Ann. § 68.085;

Ga. Code. Ann. § 23-3-122(g);

Haw. Rev. Stat. § 661-27;

740 Ill. Comp. Stat. § 175/4(d);

Ind. Code § 5-11-5.5-6;

Iowa Code Ann. § 685.3;

Mass. Gen. Laws Ch. 12 § 5F;

Minn. Stat. § 15C.13;

Mont. Code Ann. § 17-8-410;

Nev. Rev. Stat. Ann. § 357.210;

N.J. Stat. Ann. § 2A:32C-7;

N.M. Stat. Ann. § 27-14-9 and § 44-9-7;

66

N.Y. State Fin. Law § 190.6;

N.C. Gen. Stat. Ann. 52 § 1-610;

R.I. Gen. Laws § 9-1.1-4;

Tenn. Code Ann. § 71-5-183;

Va. Code Ann. § 8.01-216.7;

D.C. Code Ann. § 2-308.15;

Administrative Code §7-803.

C.    Relators be awarded all costs and expenses associated with each of the pendent State claims, plus attorney's fees as provided pursuant to:

Cal. Govt. Code § 12652(g)(8);

6 Del. C. § 1205;

Fla. Stat. Ann. § 68.086;

Ga. Code. Ann. § 23-3-121(c);

Haw. Rev. Stat. § 661-27;

740 Ill. Comp. Stat. § 175/4(d);

Ind. Code § 5-11-5.5-6;

Iowa Code §685.2;

Mass. Gen. Laws Ch. 12 § 5F;

Minn. Stat. § 15C.12

Mont. Code Ann. § 17-8-411;

Nev. Rev. Stat. Ann. § 357.180;

N.J. Stat. Ann. § 2A:32C-8;

N.M. Stat. Ann. § 27-14-9 and § 44-9-7;

N.Y. State Fin. Law § 190.7;

N.C. Gen. Stat. Ann. 52 § 1-613;

R.I. Gen. Laws § 9-1.1-4;

Tenn. Code Ann. § 71-5-183;

Va. Code Ann. § 8.01-216.7;

D.C. Code Ann. § 2-308.15;

Administrative Code §7-803.

D.      Relators and the State Plaintiffs be awarded such other and further relief as the

Court may deem to be just and proper.

## TRIAL BY JURY

Relators hereby demand a trial by jury as to all issues.

Dated: November 8, 2013                          Respectfully submitted,

By: _____

Robert A. Magnanini, Esq.
David B. Harrison, Esq.
STONE & MAGNANINI LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ  07078
Tel.: (973) 218-1111
Fax:  (973) 218-1106

*Attorneys for Relator*

# EXHIBIT 2

# (submitted in camera)

# EXHIBIT 3

| | Fee Category | Values | | | | Total Amount |
|---|---|---|---|---|---|---|
| | A-Substantive | | B-Fee Application | | Total Time | |
| Year | Time | Amount | Time | Amount | | |
| 2013 | 245.7 | $125,163.33 | | | 245.7 | $125,163.33 |
| 2014 | 259.9 | $130,338.51 | | | 259.9 | $130,338.51 |
| 2015 | 177.0 | $68,717.00 | | | 177.0 | $68,717.00 |
| 2016 | 233.1 | $102,146.50 | 111.3 | $52,696.50 | 344.4 | $154,843.00 |
| 2017 | | | 22.7 | $12,541.00 | 22.7 | $12,541.00 |
| **Grand Total** | **915.7** | **$426,365.34** | **134.0** | **$65,237.50** | **1,049.7** | **$491,602.84** |

| | Fee Category | Values | | | | Total Amount |
|---|---|---|---|---|---|---|
| | A-Substantive | | B-Fee Application | | Total Time | |
| Employee | Time | Amount | Time | Amount | | |
| Alex Howell | 248.7 | $86,987.50 | 53.9 | $18,865.00 | 302.6 | $105,852.50 |
| Bradford Muller | | | 18.1 | $9,955.00 | 18.1 | $9,955.00 |
| Brian S. Rawson | 66.2 | $11,262.51 | 9.1 | $1,547.00 | 75.3 | $12,809.51 |
| David Harrison | 334.1 | $152,717.50 | | | 334.1 | $152,717.50 |
| David Stone | 33.7 | $27,443.33 | 3.0 | $2,460.00 | 36.7 | $29,903.33 |
| Robert Magnanini | 208.5 | $142,809.50 | 44.9 | $31,285.50 | 253.4 | $174,095.00 |
| Tara Saybe | 24.5 | $5,145.00 | 5.0 | $1,125.00 | 29.5 | $6,270.00 |
| **Grand Total** | **915.7** | **$426,365.34** | **134.0** | **$65,237.50** | **1,049.7** | **$491,602.84** |

## Stone & Magnanini Expense Summary

| Row Labels | Sum of Amount |
|---|---|
| Computer Research | $ 1,387.02 |
| Courier Service | $ 383.45 |
| Filing Fee | $ 400.00 |
| Meals | $ 548.96 |
| Telephone | $ 28.43 |
| Travel, Mileage & Parking | $ 3,326.35 |
| Data Management | $ 8,329.15 |
| **Grand Total** | **$ 14,403.36** |

| Row Labels | Sum of Amount |
|---|---|
| ALM | $ 699.00 |
| Clerk, Southern District of New York | $ 400.00 |
| DANIELLE MORIBER. | $ 14.76 |
| DAVID HARRISON. | $ 1,004.78 |
| Exhibit A Same Day Delivery LLC | $ 123.00 |
| FEDERAL EXPRESS | $ 137.17 |
| LEXIS NEXIS-1401VC | $ 542.82 |
| LexisNexis- 424VCM774 | $ 71.99 |
| PACER SERVICE CENTER | $ 59.10 |
| Rational eDiscovery, LLC | $ 7,058.49 |
| ROBERT MAGNANINI. | $ 2,750.77 |
| SiteLogistix | $ 1,270.66 |
| TELECONFERENCING SERVICES | $ 28.43 |
| THOMSON REUTERS - WEST - 1003884064 | $ 14.11 |
| UPS | $ 123.28 |
| (blank) | $ 105.00 |
| **Grand Total** | **$ 14,403.36** |

# EXHIBIT 4



**2015 NLJ Billing Survey**

**Source: National Law Journal**

**Category: National Law Journal**

ALM Legal Intelligence, in association with The National Law Journal, collected 2015 hourly billing rates for partners, associates, of counsel and paralegals. The data sources include the published rates from the 20 largest federal bankruptcy jurisdictions and a survey of the nation's 350 largest firms conducted during October and November of 2015.  Individual firm rates are not identified.

**Hourly Billing Rates for 2015**

| | Partner | | | Associate | | | Of Counsel | | | Paralegal | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | High | Low | Median | High | Low | Median | High | Low | Median | High | Low | Median |
| **Overall Hourly Rates** | $1,295 | $90 | $395 | $950 | $50 | $350 | $1,120 | $125 | $350 | $325 | $25 | $125 |
| **Rates by Firm Size** | | | | | | | | | | | | |
| 1 - 25 lawyers | $1,080 | $90 | $350 | $950 | $90 | $300 | $645 | $125 | $350 | $325 | $25 | $115 |
| 26 - 150 lawyers | $1,050 | $190 | $460 | $900 | $100 | $300 | $620 | $225 | $393 | $305 | $75 | $173 |
| 151 or more lawyers | $1,295 | $100 | $595 | $975 | $125 | $325 | $1,120 | $270 | $610 | $325 | $35 | $220 |
| **Rates by State** | | | | | | | | | | | | |
| AL | $725 | $200 | $375 | $375 | $175 | $300 | $495 | $290 | $393 | n/a | n/a | n/a |
| AZ | $750 | $125 | $375 | $750 | $175 | $250 | $750 | $250 | $300 | $250 | $75 | $125 |
| CA | $1,080 | $200 | $495 | $950 | $300 | $350 | $595 | $175 | $450 | $325 | $25 | $150 |
| CO | $893 | $350 | $443 | $642 | $150 | $325 | $400 | $325 | $363 | $285 | $75 | $158 |
| CT | $1,200 | $295 | $350 | $625 | $175 | $350 | $550 | $325 | $438 | $290 | $75 | $100 |
| DC | $1,095 | $975 | $1,035 | $655 | $350 | $375 | $775 | $275 | $750 | n/a | n/a | n/a |
| DE | $1,050 | $295 | $650 | $850 | $260 | $388 | $525 | $260 | $275 | $305 | $125 | $235 |
| FL | $625 | $175 | $375 | $525 | $100 | $300 | n/a | n/a | n/a | $255 | $65 | $123 |
| GA | $500 | $250 | $358 | $450 | $110 | $275 | $250 | $240 | $245 | $160 | $50 | $120 |
| L | $985 | $200 | $420 | $710 | $150 | $300 | $1,120 | $395 | $430 | $215 | $75 | $120 |
| IN | $400 | $250 | $305 | $400 | $200 | $275 | $300 | $225 | $295 | $220 | $90 | $100 |
| KY | $340 | $200 | $290 | $350 | $200 | $275 | n/a | n/a | n/a | $150 | $75 | $105 |
| LA | $575 | $150 | $333 | $500 | $100 | $250 | $425 | $200 | $350 | $285 | $45 | $83 |
| MA | $650 | $300 | $475 | $500 | $260 | $350 | $500 | $260 | $350 | n/a | n/a | n/a |
| MD | $560 | $250 | $363 | $580 | $150 | $325 | $350 | $250 | $275 | $280 | $75 | $125 |
| MI | $375 | $190 | $265 | $400 | $125 | $275 | n/a | n/a | n/a | $125 | $75 | $103 |
| NC | $675 | $250 | $425 | $435 | $150 | $275 | n/a | n/a | n/a | $180 | $75 | $110 |
| NJ | $880 | $250 | $400 | $400 | $150 | $298 | $565 | $225 | $325 | $195 | $65 | $120 |
| NM | n/a | n/a | n/a | $350 | $175 | $200 | n/a | n/a | n/a | n/a | n/a | n/a |
| NV | $450 | $295 | $375 | $500 | $200 | $325 | n/a | n/a | n/a | $240 | $75 | $152 |
| NY | $1,295 | $100 | $420 | $975 | $90 | $350 | $930 | $250 | $573 | $325 | $60 | $130 |
| OH | $545 | $250 | $313 | $330 | $155 | $250 | n/a | n/a | n/a | $135 | $85 | $100 |
| OR | $485 | $315 | $370 | $325 | $230 | $300 | $450 | $310 | $380 | $220 | $145 | $185 |
| PA | $875 | $200 | $350 | $565 | $86 | $257 | $440 | $300 | $325 | $325 | $75 | $105 |
| PR* | $300 | $100 | $200 | $350 | $100 | $200 | $250 | $125 | $188 | $150 | $45 | $75 |
| TN | $735 | $225 | $300 | $350 | $150 | $250 | $300 | $270 | $300 | $150 | $50 | $90 |
| TX | $925 | $90 | $395 | $650 | $150 | $298 | $740 | $225 | $320 | $290 | $35 | $100 |
| VA | $545 | $220 | $335 | $495 | $175 | $295 | $400 | $300 | $350 | $325 | $75 | $95 |
| WA | $965 | $275 | $460 | $375 | $150 | $350 | n/a | n/a | n/a | $215 | $125 | $143 |
| WI | $595 | $560 | $578 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

n/a: data not available
*Puerto Rico is a U.S. Territory

# EXHIBIT 5

# Stone & Magnanini, LLP
## Transaction Report 3065.001 - Patrick Lester

**All Dates**

| Category | Vendor | Date | Type | Num | Name | Memo/Description | Amount |
|---|---|---|---|---|---|---|---|
| Computer Research | LEXIS NEXIS-1401VC | 01/31/2014 | Bill | 1401360199 | LEXIS NEXIS-1401VC | Computer Research | 16.92 |
| Computer Research | PACER SERVICE CENTER | 02/08/2014 | Bill | BS1567-Q42013 | PACER SERVICE CENTER | | 2.20 |
| Computer Research | PACER SERVICE CENTER | 04/21/2014 | Bill | | PACER SERVICE CENTER | Pacer research | 2.50 |
| Computer Research | LEXIS NEXIS-1401VC | 08/20/2014 | Bill | 1408356265 | LEXIS NEXIS-1401VC | Computer research | 214.30 |
| Computer Research | LEXIS NEXIS-1401VC | 08/20/2014 | Bill | 1408356265 | LEXIS NEXIS-1401VC | Computer research | 125.41 |
| Computer Research | PACER SERVICE CENTER | 07/03/2013 | Bill | BS1567-Q22013 | PACER SERVICE CENTER | Pacer | 0.10 |
| Computer Research | PACER SERVICE CENTER | 09/30/2013 | Bill | | PACER SERVICE CENTER | | 12.60 |
| Computer Research | LEXIS NEXIS-1401VC | 05/15/2015 | Bill | 1505314381 | LEXIS NEXIS-1401VC | Lexis Nexis | 29.65 |
| Computer Research | LEXIS NEXIS-1401VC | 07/31/2015 | Bill | 1507313539 | LEXIS NEXIS-1401VC | Lexis Nexis | 32.61 |
| Computer Research | PACER SERVICE CENTER | 01/07/2016 | Bill | 2836749-Q42015 | PACER SERVICE CENTER | Pacer research 2836749-Q4 2015 | 1.30 |
| Computer Research | LEXIS NEXIS-1401VC | 03/31/2016 | Bill | 1603310146 | LEXIS NEXIS-1401VC | Lexis Nexis computer research | 123.93 |
| Computer Research | THOMSON REUTERS - WEST - 1003884064 | 04/01/2016 | Bill | 833761029 | THOMSON REUTERS - WEST - 1003884064 | Thomson Reuters Computer Research | 3.50 |
| Computer Research | PACER SERVICE CENTER | 04/07/2016 | Bill | 2836749-Q12016 | PACER SERVICE CENTER | Pacer research Quarter #1 2016 | 9.10 |
| Computer Research | THOMSON REUTERS - WEST - 1003884064 | 05/01/2016 | Bill | 833945842 | THOMSON REUTERS - WEST - 1003884064 | Thomson Reuters computer research | 10.61 |
| Computer Research | PACER SERVICE CENTER | 07/05/2016 | Bill | 283674+-Q22016 | PACER SERVICE CENTER | Pacer research Quarter #2 2016 | 5.20 |
| Computer Research | LexisNexis- 424VCM774 | 08/31/2016 | Bill | 3090661145 | LexisNexis- 424VCM774 | Lexisnexis computer research | 71.99 |
| Computer Research | PACER SERVICE CENTER | 10/05/2016 | Bill | 283649-Q32016 | PACER SERVICE CENTER | Pacer research Quarter #3 2016 | 26.10 |
| Computer Research | ALM | 2/7/2017 | | | | ALM Survey | 699.00 |
| Courier Service | FEDERAL EXPRESS | 12/06/2013 | Bill | 2-497-30945 | FEDERAL EXPRESS | Courier Service - Bryan Kessler | 15.06 |
| Courier Service | FEDERAL EXPRESS | 12/09/2013 | Bill | 2-489-855592 | FEDERAL EXPRESS | Courier Service - Liz Brennan - U.S. Dept. of Justice | 17.33 |
| Courier Service | FEDERAL EXPRESS | 12/30/2013 | Bill | 2-505-09533 | FEDERAL EXPRESS | Courier Service - Joan Kern | 54.75 |
| Courier Service | Exhibit A Same Day Delivery LLC | 01/17/2014 | Bill | 11541 | Exhibit A Same Day Delivery LLC | Service of Summons & Complaint-1/7/14 | 123.00 |
| Courier Service | FEDERAL EXPRESS | 03/10/2014 | Bill | 2-583-59629 | FEDERAL EXPRESS | Courier service to Cristy Phillips, Sou hern District of NY | 15.93 |
| Courier Service | FEDERAL EXPRESS | 08/11/2014 | Bill | 2-744-85560 | FEDERAL EXPRESS | Courier Service | 17.22 |
| Courier Service | FEDERAL EXPRESS | 03/09/2015 | Bill | 2-961-87639 | FEDERAL EXPRESS | Courier Service | 16.88 |
| Courier Service | UPS | 08/08/2015 | Bill | 16FE5325 | UPS | Courier Service | 32.36 |
| Courier Service | UPS | 12/19/2015 | Bill | 16FE5515 | UPS | Courier Service | 32.13 |
| Courier Service | UPS | 03/26/2016 | Bill | 16FE5136 | UPS | Courier Service | 40.08 |
| Courier Service | UPS | 08/20/2016 | Bill | 16FE5346 | UPS | Courier Service | 18.71 |
| Filing Fee | Clerk, Southern District of New York | 11/07/2013 | Bill | | Clerk, Southern District of New York | | 400.00 |
| Meals | DAVID HARRISON. | 08/02/2013 | Bill | 08/02/13-PER | DAVID HARRISON. | | 113.65 |
| Meals | ROBERT MAGNANINI. | 12/23/2013 | Bill | PER | ROBERT MAGNANINI. | Working dinner with clients - 12/9/13 | 253.31 |
| Meals | ROBERT MAGNANINI. | 12/23/2013 | Bill | PER | ROBERT MAGNANINI. | Working lunch with D. Harrison and clients during USAO mee ing | 97.00 |
| Meals | ROBERT MAGNANINI. | 09/30/2014 | Bill | 9/30/14-PER | ROBERT MAGNANINI. | Working dinner with D. Harrison | 85.00 |
| Telephone | TELECONFERENCING SERVICES | 08/31/2013 | Bill | 11789054 | TELECONFERENCING SERVICES | Teleconference Services | 1.57 |
| Telephone | TELECONFERENCING SERVICES | 09/30/2013 | Bill | 11801941 | TELECONFERENCING SERVICES | Teleconference Services | 14.08 |

| Category | Vendor | Date | Type | Num | Name | Memo/Description | Amount |
|---|---|---|---|---|---|---|---|
| Telephone | TELECONFERENCING SERVICES | 07/31/2014 | Bill | 11925960 | TELECONFERENCING SERVICES | Teleconferencing Services | 7.12 |
| Telephone | TELECONFERENCING SERVICES | 11/30/2014 | Bill | 11976234 | TELECONFERENCING SERVICES | Teleconferencing services | 5.66 |
| Travel, Mileage & Parking | DAVID HARRISON. | 07/18/2013 | Bill | | DAVID HARRISON. | | 627.89 |
| Travel, Mileage & Parking | DAVID HARRISON. | 08/02/2013 | Bill | 08/02/13-PER | DAVID HARRISON. | | 163.49 |
| Travel, Mileage & Parking | DAVID HARRISON. | 11/05/2013 | Bill | 11/05/13-PER | DAVID HARRISON. | | 61.08 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 12/03/2013 | Bill | 12/03/13-PER | ROBERT MAGNANINI. | | 415.80 |
| Travel, Mileage & Parking | | 12/13/2013 | Check | | 3065.001 - Patrick Lester | Travel | 105.00 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 12/23/2013 | Bill | PER | ROBERT MAGNANINI. | Hotel rooms for clients | 277.20 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 12/23/2013 | Bill | PER | ROBERT MAGNANINI. | Hotel rooms for clients | 151.80 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 12/23/2013 | Bill | PER | ROBERT MAGNANINI. | Tolls for meeting with USAO - 12/10/13 | 18.25 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 12/23/2013 | Bill | PER | ROBERT MAGNANINI. | Travel to and from NYC for meeting with USAO (76 miles) - 12/10/13 | 44.46 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 12/23/2013 | Bill | PER | ROBERT MAGNANINI. | Hotel rooms for clients | 151.80 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 12/23/2013 | Bill | PER | ROBERT MAGNANINI. | Parking for R. Magnanini and D. Harrison | 70.00 |
| Travel, Mileage & Parking | DAVID HARRISON. | 12/31/2013 | Bill | 12/26/13-PER | DAVID HARRISON. | Travel - gas & mileage | 38.67 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 09/30/2014 | Bill | 9/30/14-PER | ROBERT MAGNANINI. | Parking in Buffalo | 11.00 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 09/30/2014 | Bill | 9/30/14-PER | ROBERT MAGNANINI. | Parking | 33.00 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 09/30/2014 | Bill | 9/30/14-PER | ROBERT MAGNANINI. | Travel to and from Newark Airport - 30 miles | 17.55 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 09/30/2014 | Bill | 9/30/14-PER | ROBERT MAGNANINI. | Rental car from Rochester to Buffalo | 123.25 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 09/30/2014 | Bill | 9/30/14-PER | ROBERT MAGNANINI. | Airline fare for F. Magnanini & D. Harrison to Rochester & Buffalo for meetings | 994.40 |
| Travel, Mileage & Parking | ROBERT MAGNANINI. | 01/26/2015 | Bill | 1/2615-PER | ROBERT MAGNANINI. | Tolls from rental car | 6.95 |
| Travel, Mileage & Parking | DANIELLE MORIBER. | 04/16/2015 | Bill | March 25-26 PER | DANIELLE MORIBER. | Lester: Cab fare re filing change of address in active case under seal in SDNY | 14.76 |
| Data Management | SiteLogistix | 07/31/2014 | Bill | 632289 | SiteLogistix | Eclipse Monthly Hosting - July 2014 | 242.45 |
| Data Management | SiteLogistix | 09/30/2014 | Bill | 632839 | SiteLogistix | Eclipse Monthly Hosting - September 2014 | 63.50 |
| Data Management | SiteLogistix | 10/31/2014 | Bill | 632994 | SiteLogistix | Consulting Fee | 63.50 |
| Data Management | Rational eDiscovery, LLC | 03/31/2015 | Bill | 4456A | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Project Management- Matt Perfetti 3/4/15, 3/5/15, 3/11/15, 3/30/15 - Included in Monthly Pricing | 0.00 |
| Data Management | Rational eDiscovery, LLC | 03/31/2015 | Bill | 4529 | Ra ional eDiscovery, LLC | Rational eDiscovery Monthly hosting fee for March 2015 | 16.97 |
| Data Management | SiteLogistix | 08/31/2014 | Bill | 632662 | SiteLogistix | Consulting Fee | 901.21 |
| Data Management | Rational eDiscovery, LLC | 11/30/2014 | Bill | 4113B | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Monthly Fee per GB | 30.48 |
| Data Management | Rational eDiscovery, LLC | 11/30/2014 | Bill | 4113B | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Fee for Contingency Cases - 25% | 7.62 |

| Category | Vendor | Date | Type | Num | Name | Memo/Description | Amount |
|---|---|---|---|---|---|---|---|
| Data Management | Rational eDiscovery, LLC | 12/31/2014 | Bill | 4212B | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB | 30.48 |
| Data Management | Rational eDiscovery, LLC | 12/31/2014 | Bill | 4212B | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Fee for Contingency Cases - 25% | 7.62 |
| Data Management | Rational eDiscovery, LLC | 01/31/2015 | Bill | 4303B | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB | 43.32 |
| Data Management | Rational eDiscovery, LLC | 01/31/2015 | Bill | 4303B | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Document Processing | 53.50 |
| Data Management | Rational eDiscovery, LLC | 01/31/2015 | Bill | 4303B | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Fee for Contingency Cases - 25% | 24.21 |
| Data Management | Rational eDiscovery, LLC | 02/28/2015 | Bill | 4455A | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB | 43.32 |
| Data Management | Rational eDiscovery, LLC | 02/28/2015 | Bill | 4455A | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Fee for Contingency Cases - 25% | 10.83 |
| Data Management | Rational eDiscovery, LLC | 03/31/2015 | Bill | 4456A | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Document Processing | 265.50 |
| Data Management | Rational eDiscovery, LLC | 03/31/2015 | Bill | 4456A | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB | 43.32 |
| Data Management | Rational eDiscovery, LLC | 03/31/2015 | Bill | 4456A | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Fee for Contingency Cases - 25% | 90.57 |
| Data Management | Rational eDiscovery, LLC | 03/31/2015 | Bill | 4456A | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB prorated | 53.45 |
| Data Management | Rational eDiscovery, LLC | 04/30/2015 | Bill | 4526 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 107.04 |
| Data Management | Rational eDiscovery, LLC | 04/30/2015 | Bill | 4526 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 26.76 |
| Data Management | Rational eDiscovery, LLC | 05/31/2015 | Bill | 4585 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 107.04 |
| Data Management | Rational eDiscovery, LLC | 05/31/2015 | Bill | 4585 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 26.76 |
| Data Management | Rational eDiscovery, LLC | 06/30/2015 | Bill | 4657 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 26.76 |
| Data Management | Rational eDiscovery, LLC | 06/30/2015 | Bill | 4657 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 107.04 |
| Data Management | Rational eDiscovery, LLC | 07/31/2015 | Bill | 4735 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 107.04 |
| Data Management | Rational eDiscovery, LLC | 07/31/2015 | Bill | 4735 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 26.76 |
| Data Management | Rational eDiscovery, LLC | 08/31/2015 | Bill | 4782 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB Data Processing | 93.00 |
| Data Management | Rational eDiscovery, LLC | 08/31/2015 | Bill | 4782 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 75.64 |
| Data Management | Rational eDiscovery, LLC | 08/31/2015 | Bill | 4782 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Project Management | 96.00 |
| Data Management | Rational eDiscovery, LLC | 08/31/2015 | Bill | 4782 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 113.56 |
| Data Management | Rational eDiscovery, LLC | 09/30/2015 | Bill | 4881 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Project Management | 128.00 |
| Data Management | Rational eDiscovery, LLC | 09/30/2015 | Bill | 4881 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 135.47 |
| Data Management | Rational eDiscovery, LLC | 09/30/2015 | Bill | 4881 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 154.35 |
| Data Management | Rational eDiscovery, LLC | 09/30/2015 | Bill | 4881 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB Data Processing | 259.50 |

| Category | Vendor | Date | Type | Num | Name | Memo/Description | Amount |
|---|---|---|---|---|---|---|---|
| Data Management | Rational eDiscovery, LLC | 10/31/2015 | Bill | 4936 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 240.60 |
| Data Management | Rational eDiscovery, LLC | 10/31/2015 | Bill | 4936 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 153.15 |
| Data Management | Rational eDiscovery, LLC | 10/31/2015 | Bill | 4936 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB Data Processing | 372.00 |
| Data Management | Rational eDiscovery, LLC | 11/30/2015 | Bill | 5007 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Fee for Contingency | 70.23 |
| Data Management | Rational eDiscovery, LLC | 11/30/2015 | Bill | 5007 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 12/31/2015 | Bill | 5063 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Contingency Fee | 70.23 |
| Data Management | Rational eDiscovery, LLC | 12/31/2015 | Bill | 5063 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 12/31/2015 | Bill | 5064 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Media | 25.00 |
| Data Management | Rational eDiscovery, LLC | 12/31/2015 | Bill | 5063 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Project Management 12/10/15-12/11/15 Matt Perfetti | 144.00 |
| Data Management | Rational eDiscovery, LLC | 12/31/2015 | Bill | 5063 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Analyst hours included in mon hly pricing | -144.00 |
| Data Management | Rational eDiscovery, LLC | 01/31/2016 | Bill | 5119 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 01/31/2016 | Bill | 5119 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 70.23 |
| Data Management | Rational eDiscovery, LLC | 02/29/2016 | Bill | 5178 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee Per GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 02/29/2016 | Bill | 5178 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Contingency Case Fee | 70.23 |
| Data Management | Rational eDiscovery, LLC | 03/31/2016 | Bill | 5234 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 03/31/2016 | Bill | 5234 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 70.23 |
| Data Management | Rational eDiscovery, LLC | 04/30/2016 | Bill | 5280 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 04/30/2016 | Bill | 5280 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 70.23 |
| Data Management | Rational eDiscovery, LLC | 05/31/2016 | Bill | 5330 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 05/31/2016 | Bill | 5330 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC Contingent Case | 70.23 |
| Data Management | Rational eDiscovery, LLC | 06/30/2016 | Bill | 5385 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 06/30/2016 | Bill | 5385 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Fee for Contingency Cases | 70.23 |
| Data Management | Rational eDiscovery, LLC | 07/31/2016 | Bill | 5436 | Ra ional eDiscovery, LLC | Rational eDiscovery, Llc - Analyst hours included in mon hly pricing | -640.00 |
| Data Management | Rational eDiscovery, LLC | 07/31/2016 | Bill | 5436 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Mon hly Fee per GB | 280.92 |
| Data Management | Rational eDiscovery, LLC | 07/31/2016 | Bill | 5436 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Contingency Case Fee | 222.23 |
| Data Management | Rational eDiscovery, LLC | 07/31/2016 | Bill | 5436 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Project Management Services 7/13/16-7/28/16 | 1,248.00 |
| Data Management | Rational eDiscovery, LLC | 09/30/2015 | Bill | 4882 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Federal Express Reimbursement | 17.22 |

| Category | Vendor | Date | Type | Num | Name | Memo/Description | Amount |
|---|---|---|---|---|---|---|---|
| Data Management | Rational eDiscovery, LLC | 12/31/2015 | Bill | 5064 | Ra ional eDiscovery, LLC | Rational eDiscovery, LLC - Courier Reimbursement | 18.26 |
| **Total** | | | | | | | **14,403.36** |

Tuesday, Feb 07, 2017 12:11:12 PM GMT-8 - Accrual Basis